**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FOUNDATION MEDICINE, INC.,<br>Plaintiff,<br>vs.<br>CAMERON KITTLE,<br>Defendant. | Civil Action No. 1:25-cv-10298 |

## COMPLAINT

Plaintiff Foundation Medicine, Inc. ("FMI" or "the Company"), by its undersigned attorneys, commences this action against defendant Cameron Kittle ("Kittle" or "Defendant"), and alleges as follows:

## PARTIES

1. FMI is a Delaware corporation with its corporate headquarters and principal place of business located at 400 Summer Street, Boston, Massachusetts, 02210.

2. Kittle is an individual who, upon information and belief, resides in Exeter, New Hampshire.

## JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Kittle because he expressly consented to personal jurisdiction in state and federal courts in Massachusetts in his Employee Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement (the "Agreement"), from which this action arises. *See* Agreement, a true and correct copy of which is attached hereto as **Exhibit 1**, § 9(l). Specifically Kittle agreed that "[a]ny claims or legal actions by one party against the other [under the Agreement] shall be commenced and maintained in a state or federal court located in Boston, Massachusetts," and that he "submit[ted] to the jurisdiction and venue of

any such court."

4. This Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

5. Venue is proper in this Court because Kittle has expressly consented that the exclusive venue and forum for any actions arising under the Agreement shall be the federal and state courts in Boston, Massachusetts (*see* **Exhibit 1**, § 9(l)), because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district, and because all parties to this action are subject to personal jurisdiction in Massachusetts as set forth above.

## FACTS

### FMI's Business

6. FMI is a molecular information company focused on fundamentally changing the way in which patients with cancer are evaluated and treated. FMI aims to simplify the complex nature of cancer genomics, bringing cutting-edge science and technology to everyday cancer care, using best-in-class products and services that empower the work of physicians, researchers, and all those engaged in the fight against cancer globally.

7. FMI harnesses next-generation sequencing and other advanced technologies to develop clinical laboratory tests that broadly capture relevant tumor, genomic, and other molecular information in an individual's disease and connect it with a knowledge base of relevant clinical data used by oncologists to determine the best treatment.

8. FMI derives revenue from selling services that are enabled by its molecular information platform to physicians and biopharmaceutical partners throughout the world.

9. FMI's products and services provide genomic insights about each patient's individual cancer obtained from that analysis, enabling physicians to optimize treatments in clinical practice and biopharmaceutical partners to develop targeted therapies and immunotherapies more effectively.

10. Among other monitoring products and services, FMI is currently developing one or more new molecular residual disease tests ("MRD Pipeline Products"). MRD is an industry term used to refer to the residual amount of circulating tumor DNA (ctDNA) that remain in a patient's body after treatment (e.g., surgery or therapeutic treatment) and is accordingly closely associated with disease recurrence or relapse in patients. The existence of such ctDNA is typically apparent before current standard of care evaluations, such as standard imaging. It is hypothesized that MRD testing can lead to better patient outcomes by identifying the presence of disease with greater sensitivity than imaging alone, whether by indicating the need for additional treatment sooner than would otherwise be identified, or by identifying specific treatment modifications that will best target specific vulnerabilities in the remaining cancer cells. Additionally, these highly sensitive MRD assays can be used to monitor treatment progress in clinical cases where high sensitivity is required, such as neo-adjuvant treatment in early-stage disease. FMI has released only limited information about its MRD Pipeline Products and has not even publicly announced the product name or specific launch date.

11. Additionally, FMI has recently launched incubator lab services which offer confidential research collaborations related to early-stage biomarkers and assays currently in development at FMI (hereinafter "Incubator Lab Services). These services allow FMI's partners access to some of FMI's biomarkers and assays that are still in development or early research. Many of these Incubator Lab Services are relevant (or may be relevant someday) to MRD Pipeline

Products and may be helpful in improving MRD testing. Much like the MRD Pipeline Products, FMI has gone to great measures to only disclose extremely limited information about the Incubator Lab Services. In fact, to date, all promotional materials describing FMI's most confidential Incubator Lab Services have only been approved for use along with a confidentiality disclosure agreement ("CDA") and are labeled "Confidential-Do Not Distribute." Furthermore, in contracting to provide Incubator Lab Services, FMI obligates its partners to keep confidential any information related to its assays, including the forementioned Incubator Lab Services.

**<u>FMI's Confidential Information and Goodwill</u>**

12. FMI maintains a legitimate business interest in its confidential and proprietary information, customers, and goodwill, including its employees' access to and knowledge of confidential information.

13. FMI faces stiff competition from companies that offer competitive products. Comprehensive genomic profiling in the oncology space, and especially the analysis of ctDNA to monitor MRD, is a relatively new area of science, with new, cutting-edge advancements and discoveries being made continually.

14. FMI has been a critical contributor to advancements in genomic profiling as well as other multiomic profiling such as epigenetics, transcriptomics, and fragmentomics—all of which could very well play a critical role in identifying the presence of disease at lower levels. As a result, there is a significant amount of research and data available at FMI that could be beneficial to its competitors developing MRD testing. FMI's confidential information is thus valuable because it provides FMI with a distinct competitive advantage, and given that the nature of the industry is highly competitive, with extremely narrow bands of competitors (particularly in the MRD space), the confidential information has independent economic value to FMI because it is

not known to others.

15. FMI's success rests in substantial part upon its development and ownership of certain trade secrets and other confidential, proprietary information. FMI's confidential information includes, but is not limited to, FMI's confidential sales and product development strategies, product roadmaps, information about customer and prospect relationships, product information including performance metrics, strategies for product integration into other platforms, project management protocols and processes, revenue forecasting processes, marketing strategies, customer needs, service histories and preferences, pricing, and margins, among other things.

16. To gain a foothold in the market and drive success of its products, FMI has spent years developing new products and technologies, as well as strategies to market such products to customers, which work continues to this day. FMI has thus compiled highly targeted and confidential information that gives it a leg up in the industry.

17. FMI has devoted substantial time, effort, money, and other resources to the development, acquisition, maintenance, and protection of its confidential information by, among other things, restricting access to such information, requiring all content be reviewed by the appropriate committees before disclosure outside FMI, and requiring employees to sign confidentiality agreements and other restrictive covenants. Indeed, all FMI employees are required, as a condition of their employment, to agree to confidentiality obligations.

18. Additionally, FMI employees with access to its most sensitive information, such as Kittle, are required to execute non-competes (where legally permissible), and acknowledge that an obligation not to disclose FMI's trade secrets, alone, would be insufficient to protect FMI's legitimate business interests. FMI would not provide these employees with access to such confidential information without their agreement to abide by these restrictive covenants.

19. In addition, all of FMI's computers that are distributed to its employees are password protected and encrypted. FMI's confidential information is also kept in secure repositories, and FMI carefully restricts access to its confidential information so that only those employees with a legitimate "need to know" can access the same through password protected systems.

20. Moreover, FMI has a rigorous review process for evaluating any information prior to public disclosure as a further safeguard for protecting confidential information. This process is handled in part by FMI's Promotional Review Committee ("PRC"). In addition to protecting confidential information from leaving FMI unintentionally, review of content by PRC ensures that FMI is compliant with applicable laws and regulations, minimizes or avoids financial and reputational harm, and ensures accuracy and scientific soundness of materials, as well as consistency of company messaging and brand guidelines. Kittle was responsible for this process on his team, liaising with Medical, Legal, Regulatory and Compliance stakeholders to negotiate wording and finalize marketing claims in public-facing promotional materials.

21. While FMI has released some *extremely* limited information about its forthcoming MRD Pipeline Products and almost no publicly available information about its Incubator Lab Services, it retains an enormous amount of confidential information about these products that has been developed through significant time and expense, and FMI has taken great pains to shield this information from public disclosure (and even internal disclosure, for employees that do not have a need to know this information). For example, as mentioned above, FMI has only approved promotional materials describing the most sensitive and confidential Incubator Lab Services for use under a CDA, and has labeled those materials accordingly.

22. Indeed, even as to its fully commercialized products that are already on the market, FMI—like most companies—maintains highly confidential information that is closely guarded and not widely known, either externally or even internally beyond those with a business need to know. Here, where the MRD Pipeline Products are still months away from launch, or in the case of Incubator Lab Services, potentially years away from launch, the vast majority of information about these products is confidential and limited even within FMI.

**Foresight's Competitive Offerings**

23. Foresight Diagnostics ("Foresight") is a direct competitor of FMI. Specifically, Foresight's website states that it "develops and delivers innovative diagnostic tests that combine precision genomics and cutting-edge bioinformatics to advance cancer drug development and patient care," just like FMI.

24. Several third-party entities have identified Foresight and FMI as competitors. *See, e.g.*:

a. https://tracxn.com/d/companies/foresight-diagnostics/__JoByEkA2Gqj5v3k3zD99DsJ48B5JkPiX14Rf24jZehI#competitors-and-alternates;

b. https://www.decibio.com/insights/worldwide-liquid-biopsy-lbx-market-forecasted-to-grow-at-29-p-a-reaching-10-1b-by-2029---market-report-by-decibio-consulting-llc;

c. https://pitchbook.com/profiles/company/459135-46#faqs; and

d. https://rocketreach.co/foresight-diagnostics-inc-competitors_b7caed76c0eac792.

25. Like FMI, Foresight offers products and services focused on detecting ctDNA for the purposes of identifying MRD in solid tumors and lymphomas. Indeed, on information and belief, Foresight focuses almost entirely on MRD detection and analysis.

26. Foresight's website states that its "products and services provide a comprehensive solution to academic and biopharma collaborators, allowing access to both our circulating tumor DNA-based minimal residual disease (ctDNA-MRD) testing and our regulatory diagnostic expertise to optimize exploratory research, clinical trials, and diagnostic development programs." *See* https://foresight-dx.com/foresight-products-services/ (last visited February 6, 2025). All of the products and services mentioned on this page specifically reference MRD.

**Kittle's Employment with FMI**

27. On January 16, 2017, Kittle joined FMI as a Product Manager. Kittle was hired by and reported to then-FMI (and now Foresight) employee John Truesdell.

28. During his FMI tenure, Kittle was promoted several times, including, in March of 2018, when Kittle was promoted to Senior Product Manager.

29. In September 2019, Kittle was promoted to Associate Director, Product Marketing. The following September, Kittle's role changed to Associate Director, Corporate Strategy & Portfolio Planning.

30. In August 2022, Kittle was again promoted to Director, BioPharma Marketing, on the BioPharma Marketing & Solutions team.

31. Kittle's prior role on the product team was critical, and indeed a necessary background for, his involvement in the marketing team. More specifically, Kittle's deep knowledge of how FMI develops its products, product strategy, go-to-market plans, and execution of such strategies and plans was a necessary requirement of his new role in the BioPharma

Marketing team.

32. Finally, in August of 2023, Kittle was promoted to Senior Director, BioPharma Marketing.

33. As part of his pitch to be promoted to Senior Director, Kittle touted his involvement in the launch of the FoundationOne®Monitor and FoundationOne®Tracker products, and specifically noted the new business relationships that resulted from these launches. He also highlighted his role in having marketing materials "approved through PRC to think differently about our product roadmap in [BioPharma], leading by example with detailed development plans," and the like. He also noted that he was a leader who was "sought-out for his perspective across all groups in BioPharma, as well as key stakeholders in Medical, Commercial, R&D, to make the result better . . . "

34. In his latest role as Senior Director, Kittle was responsible for developing key marketing strategies, resources, and execution for FMI's entire diagnostic products portfolio as well as its pipeline in American and worldwide markets to drive key business results. As part of his role, Kittle was required to lead cross-functional teams and initiatives, including key message development, marketing resource development, multi-channel integration of key messaging, and launch planning for products and services.

35. Kittle was also required to be intimately familiar with FMI's products (including pipeline products not yet released or commercialized), including their actual and potential use cases, performance metrics (which includes, for example, an assay's detection rate (false negative rate and/or false positive rate) based on clinical data generated by a validation or verification study, thus requiring Kittle to understand such clinical evidence to formulate accurate marketing claims and generate associated evidence substantiating such claims), competitive strengths (and

weaknesses), and other confidential information in order to successfully translate such knowledge into customer-facing marketing materials to generate growth for FMI. In this respect, FMI's marketing is more than mere "advertising gimmicks" or "sales techniques."

36. Kittle was also responsible for "objection handling," which is a term used to describe how FMI anticipates how best to respond to customers' (or prospects') concerns or "objections" regarding FMI's products. For example, if a potential customer were to state that another company's competitive product works better or was easier to use, FMI would have appropriate responses pre-vetted to compare its products favorably.

37. As part of his responsibilities for objection handling, Kittle was required to know the possible objections and how to combat them—which included having access to and discussing confidential information that was not shared with third parties absent a non-disclosure agreement. Until recently, Kittle also had responsibility for training other FMI employees on this process.

38. Kittle's other responsibilities in this role included:

a. Leading the development and articulation of key product portfolio insights into marketing execution;

b. Focusing on product management and development, ensuring alignment with customer needs and market demands;

c. Collaborating with key internal and external stakeholders (and considering external demands) to ensure strategic co-development and subsequent alignment on strategy and position of diagnostic products within FMI's portfolio;

d. Developing pitch-decks, presentations, and other tools that effectively communicate FMI's value proposition to customers;

e. Partnering with marketing team members to ensure that messaging and tactics align

with strategic plans;

f. Ensuring marketing strategy and materials effectively reflect FMI's messaging and brand identity;

g. Partnering with and supporting customer-facing teams and cross-functional partners (including teams responsible for product launch) to create, identify, plan, and execute key strategy and align business goals with FMI's product and service offerings; and

h. Leveraging competitive intelligence to inform strategy and refine messaging.

39. Kittle's role was critical in shaping FMI's product marketing strategy, as he and his direct reports in the marketing team worked closely with FMI's innovation and new product teams to assess which product and market requirements will drive promotional plans.

40. In this role, Kittle was aware of virtually every aspect of FMI's product offerings as well as its pipeline—including the MRD Pipeline Products and Incubator Lab Services.

41. Indeed, Kittle participated in FMI's Marketing & Solutions annual planning for 2025. This process involved meeting with FMI employees responsible for every FMI product or solution (including pipeline products such as the MRD Pipeline Products), who presented their plans and strategic imperatives for the coming year. Thus, Kittle had in-depth access to highly confidential product strategy.

42. In recent months, Kittle interacted with FMI's CEO regarding the marketing for the MRD Pipeline Products, including being intimately involved in preparing a presentation regarding proposed customer outreach for these products. Kittle also worked hand-in-hand with FMI's development team on the timeline of the product launch.

43. In fact, in direct response to Foresight's own presentation on September 14, 2024

at the European Society for Medical Oncology (ESMO) Congress regarding the improved sensitivity of its MRD detection product, Foresight CLARITY™, FMI determined that it needed to begin sharing certain information regarding its forthcoming MRD Pipeline Products, which compared favorably to the data reported by Foresight. Kittle was directly involved in these discussions.

44. By way of example only, FMI decided to release certain limited information regarding the MRD Pipeline Products at the Liquid Biopsy Surveillance Summit (the "LBS Summit"), which took place on November 21-22, 2024 in Boston, in response to the aforementioned Foresight presentation. Kittle was primarily responsible for preparing this presentation.

45. Initially, the slide deck that was prepared for the LBS Summit contained a number of slides regarding the MRD Pipeline Products, including various charts and graphs with confidential data. However, as part of FMI's normal procedure of reviewing information to be shared publicly to ensure that any confidential information is withheld (a process undertaken by PRC), FMI employees revised the slide deck repeatedly, until the presentation contained a single slide regarding the MRD Pipeline Products, with only high-level detail.

46. Specifically, a senior FMI employee invited four other FMI employees—including Kittle—to a November 8, 2024 meeting to discuss his concerns regarding the level of detail initially included in the slide deck. Kittle attended this meeting, and the following business day, November 11, emailed the same group: "Following our conversation on Friday, I created this slide for consideration to replace the three data slides at the end of the . . . presentation." In other words, Kittle was directly responsible for stripping the initial slide deck of confidential information and replacing it with a single slide containing extremely limited information (which was subsequently

revised further from Kittle's November 11 draft).

47. Notably, the resulting slide that was presented at the LBS Summit did not include FMI's name for the product or anticipated launch date (other than that it is expected in 2025). Instead, the slide merely identified the use case for the product in generic terms. In particular, the slide discussed generally two types of MRD tests being considered and what performance generally could be expected for sensitivity of those types of MRD tests based on early research. There were no *specific* performance metrics included in the slide related to the MRD Pipeline Products, nor specifics about the individual MRD test types. Only the "likely" performance FMI could expect to see based on early research was included in the slide.

48. Thus, Kittle's suggestion that FMI previously "disclosed its MRD prototypes" is untrue. At most, FMI has revealed a limited "sneak peek" of what MRD prototypes it was considering, only using high-level, generalized information related to the anticipated use case and vague 2025 release.

49. Additionally, as mentioned above, Kittle possesses highly confidential information about FMI's Incubator Lab Services. As part of his role, Kittle was responsible for developing promotional materials and marketing strategies related to FMI's Incubator Lab Services. As part of developing these promotional materials and marketing strategies, Kittle gained access to information regarding many of FMI's early research biomarkers and assays. In May 2023, Kittle was responsible for developing confidential promotional materials related to the Incubator Lab Services. These materials include references to biomarkers/algorithms which are not known outside of FMI without a duty of confidentiality, and were reviewed by FMI's PRC and approved for use only along with a signed CDA. They are also clearly labeled "Confidential – Do not distribute." These biomarkers/algorithms have not been disclosed outside of FMI without strict

confidentiality obligations in place.

50. As the foregoing examples demonstrate, Kittle recently had access to detailed, highly confidential information that has specifically been excluded from the public domain, given the legitimate concerns about disclosure of such information, particularly to FMI competitors like Foresight.

51. In sum, Kittle had in-depth knowledge of FMI's products and product pipeline, including but not limited to product definitions, target audience and segments, product requirements, performance specifications (including product sensitivity and specificity and biomarker development), the competitive landscape that these products will compete with, pricing information, revenue forecasts, how the products compare to other competitive products on the market, training materials, promotional and marketing materials, technical marketing plans, competitive and market insights, market research, and FMI's annual plans, biopharma strategy, business objectives, key results, and priorities for 2025.

52. Kittle received a number of raises, bonuses, and other consideration during his tenure with FMI. At the time his FMI employment ended, his base salary was nearly $240,000. Evidencing the key role he played at FMI, Kittle was one of fewer than 20 FMI employees to receive a long-term equity retention award in September 2024, consisting of an equity grant worth over $140,000.

**Kittle's Non-Competition and Other Obligations To FMI**

53. On August 14, 2023, FMI sent Kittle a promotion offer letter in connection with his new role as Senior Director, BioPharma Marketing (the "Promotion Letter," attached here as **Exhibit 2**).

54. The Promotion Letter advised that if Kittle accepted the new role, his annualized

base salary would be $230,000—a $30,000 increase from his prior role. Kittle later received a further increase in his base salary.

55. The Promotion Letter also noted that in the new role, Kittle's annual short-term incentive bonus target would be 25% of his base salary rate, which was higher than the previous target percentage, and his long-term incentive bonus target nearly doubled from 42% to 75%. Between Kittle's increase in base salary and increase in target bonus potential, this promotion resulted in a total compensation increase of well over $100,000.

56. The Promotion Letter advised that in order to receive the proposed promotion and its associated benefits, Kittle would be required to execute the Agreement, which was attached as Exhibit A to the Promotion Letter.

57. On August 30, 2023, Kittle accepted the promotion by executing the Agreement and the Promotion Letter. Kittle never expressed any concern or confusion to FMI as to what the Agreement required, whether it was supported by adequate consideration, or whether it was reasonable and necessary to protect FMI's interests. Indeed, Kittle was already bound by a pre-existing restrictive covenants agreement with substantially similar covenants (the "Prior Agreement").

58. The Agreement contains a number of reasonable restrictive covenants designed to protect FMI's legitimate business interests, including but not limited to its trade secrets, confidential information, and customer goodwill.

59. By virtue of executing the Agreement, Kittle agreed at Section 1 that "the Company is engaged in a continuous program of research, development, production and marketing in connection with its business and that it is critical for the Company to preserve and protect its '***Confidential Information***'" (emphasis in original).

60. "Confidential Information" is defined at Section 2 of the Agreement as "all information, whether or not in writing, and whether or not disclosed before or after [Kittle] was first employed by the Company, concerning the Company's business, technology, business relationships or financial affairs that the Company has not released to the general public and all tangible embodiments thereof (collectively, '***Confidential Information***')." The Agreement further provides that, "[b]y way of illustration, Confidential Information may include information or material that has not been made generally available to the public, such as: (a) corporate information, including plans, strategies, methods, policies, resolutions, notes, email correspondence, negotiations or litigation; (b) marketing information, including strategies, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) financial information, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; and (d) operational and technological information, including plans, specifications, manuals, forms, templates, software, designs, methods, procedures, formulas, discoveries, inventions, improvements, biological or chemical materials, concepts and ideas; (e) patient information including patient medical records and all other information relating to patients and (f) employee information, including employee lists, reporting or organizational structure, resumes, employee data, compensation data, performance evaluations and separation arrangements or documentation. Confidential Information includes, without limitation, (1) information received in confidence by the Company from its customers or other third parties, and (2) all biological or chemical materials and other tangible embodiments of the Confidential Information."

61. In Section 1 of the Agreement, Kittle also agreed that "in the course of [his]

employment with the Company, [he] may gain access to certain confidential information, inventions, works of authorship, and other types of proprietary subject matter that comprise valuable, special and unique assets of the Company's business, and that access to the foregoing is granted to [Kittle] only for the purpose of enabling [him] to perform [his] duties for the Company." He further agreed that "the Company has an identifiable interest in protecting its rights and ownership of the foregoing, as well as all intellectual property rights associated therewith (including, without limitation, its patents, copyrights, trademarks, and trade secrets)."

62. Kittle agreed, in Section 3 of the Agreement, that both during and after his employment with FMI, he would "keep and hold all Confidential Information in strict confidence and trust," and would not "use, disclose, copy, reverse-engineer, distribute, lecture upon, publish, gain unauthorized access to or misappropriate any Confidential Information without the prior written consent of the Company . . . ." Kittle further agreed that he would not, at any time, "disclose or transfer any Confidential Information to anyone outside of the Company, or use or permit to be used any Confidential Information for any purpose other than the performance of [Kittle's] duties as an employee of the Company."

63. Kittle also agreed, per Section 3(a) of the Agreement, that upon termination of his employment with FMI, he would not take or retain any documents or materials or copies containing any Confidential Information.

64. Section 6 of the Agreement contained non-solicitation and non-competition restrictive covenants aimed at protecting FMI's legitimate business interests. Indeed, in Section 6(a), Kittle acknowledged and agreed that "the Company has invested substantial time, money and resources in the development of its Confidential Information including as it pertains to its customers, clients, and collaborators," and further acknowledged that "during the course of [his]

employment, [he] will have access to and may use and work with such Confidential Information and [he] agree[s] that any Confidential Information associated with any customer, client, or collaborator belongs exclusively to the Company."

65. Kittle further agreed in Section 6(a) that "an agreement not to disclose or use the Company's Confidential Information or Company-Related Developments after [his] employment by the Company ends would be inadequate, standing alone, to protect the Company's legitimate business interests, because some activities by a former employee who had held a position like [his] would, by their nature, compromise such Confidential Information and Company-Related Developments as well as the goodwill and customer relationships that the Company will pay [him] to develop for it during [his employment] by the Company." Kittle thus recognized that "activities that violate the Company's rights in this regard, whether or not intentional, are likely to be undetectable by the Company until it is too late to obtain any effective remedy, and that such activities will cause irreparable injury to the Company. To protect this kind of irreparable harm, [Kittle] agree[s] to abide [by] the covenants set forth in this Section 6."

66. In Section 6(d)(1) of the Agreement, Kittle agreed that, in recognition of FMI's substantial investment of time, money, and resources in the development of its Confidential Information, and "for the express purpose of protecting such Confidential Information," during the Restricted Period, he will not, without FMI's express written consent, directly or indirectly:

> engage, anywhere in the Restricted Territory (defined below), render services to, give advice to, consult with, or be employed by a Competing Organization (defined below) if such service, advice, consultation, or employment (1) involves supervising or managing employees who compete with the Company with respect to the same or similar services as those for which [he] was responsible for the Company during the Pre-Termination Period; (2) requires [him] to provide the same or similar services as those (i) for which [he] was responsible for the Company during the Pre- Termination Period, or (ii) for which those whom [he] supervised or managed during the Pre-Termination Period were responsible; or (3) requires or

is likely to involve the use, disclosure, or potential disclosure of Confidential Information.

67. "Pre-Termination Period" is defined in Section 6(b) of the Agreement as "last two years of [Kittle's] employment with the Company."

68. "Restricted Territory" is defined in Section 6(d)(1) of the Agreement as "each and every province, state, city or other political subdivision in which the Company or any of its affiliates carries on or actively plans to carry on any activities of the Company's business and in which [Kittle] ha[s] directly or indirectly provided services or ha[s] had a material presence or influence, including, without limitation, sales and marketing activities."

69. FMI's customers and business partners (and prospective customers and business partners) are located not only all around the country, but worldwide. Thus, in Kittle's role with FMI, he performed services and had a material presence not in a limited geographic region, but rather worldwide.

70. "Competing Organization" is defined in Section 6(d)(1) of the Agreement as "any individual or entity that develops, manufactures or markets any genomic profiling testing services or products, genomic data and information services or products, or other genomic services or products, in each instance in the field of oncology, that are competitive with the products or services that the Company has in existence or under development at the time of [Kittle's] employment or that are the subject of active planning at any time during [his] employment of which [he] ha[s] been made aware."

71. In Section 6(d)(3) of the Agreement, Kittle acknowledged and agreed that the non-compete obligations at Section 6(d)(1) are "supported by mutually-agreed upon, fair, and reasonable consideration" independent from the continuation of his employment, "as set forth in the preamble of this Agreement and Section 9(b) below, which consideration [he] would not have

received but for [his] agreement to abide by the terms of this Section 6(d)."

72. In Section 6(e) of the Agreement, Kittle acknowledged and agreed that "any change, whether material or immaterial, to the terms of [his] engagement, or [his] position, title, duties, salary, benefits, and/or compensation with the Company, shall not cause this Section 6 to terminate and shall not affect [Kittle's] obligations under this Agreement, or affect the validity or enforceability of the Agreement."

73. By virtue of signing the Agreement, Kittle acknowledged in Section 8 that the restrictions contained in the Agreement are "necessary for the protection of the business and goodwill of the Company and [Kittle] consider[s] them to be reasonable for such purpose."

74. Per Section 8 of the Agreement, Kittle also agreed that any breach of the Agreement would be likely to cause the Company "substantial and irrevocable damage," and that as a result, in the event of such a breach, in addition to other remedies available, the Company would be "entitled to specific performance and other injunctive relief without the posting of a bond."

75. Kittle also agreed in Section 8 of the Agreement that he would be obligated to pay the Company's costs of enforcing the Agreement, including attorneys' fees and expenses.

76. In Section 9(b) of the Agreement, Kittle acknowledged and agreed that the Agreement, including but not limited to the non-compete obligation in Section 6(d), is "supported by mutually-agreed upon consideration," including "eligibility for a long-term incentive grant for which [he] would otherwise not be eligible, in addition to [his] continued employment with the Company, [his] compensation and benefits associated therewith, continued training and access to and use of the Company's customer relationships and goodwill, and [his] eligibility to participate in other equity, commission and/or bonus programs." He further acknowledged and agreed that "this consideration is fair and reasonable."

77. Per Section 9(c) of the Agreement, Kittle agreed that, during the Restricted Period, he would "provide a copy of this Agreement to any prospective employer, business partner, co-venturer, or contractor prior to entering into an employment, partnership or other business relationship with such person or entity."

78. Finally, Kittle certified that he had read the Agreement carefully and was "satisfied that [he] understand[s] it completely." He also agreed that he had been provided with the Agreement at least ten business days before its effective date, and that he had the opportunity to review it with counsel of his choosing.

79. The foregoing covenants are reasonable and necessary to protect FMI's legitimate business interests because the confidential information to which Kittle had access as a FMI employee would be incredibly valuable to a competitor, and would provide such a competitor with an unfair competitive advantage in developing and/or marketing its competing products and services.

**Kittle's Resignation**

80. In December 2024, Kittle met with FMI's in-house counsel to ask if FMI pursued non-compete agreements against former employees. FMI's in-house counsel advised that FMI did pursue such obligations where a former employee went to a competitor. Notably, at that time, Kittle did not ask if FMI considered Foresight to be a competitor. On information and belief, Kittle knew that FMI considered Foresight to be a competitor

81. In late January 2025, Kittle announced his resignation from FMI to join Foresight in a "Lifecycle Management" role. Both Erin Pizzonia, FMI's Director, People Strategy Leader, and Troy Schurr, FMI's Chief Biopharma Business Officer, informed Kittle that his anticipated role with Foresight implicated his non-compete obligations.

82. Pizzonia advised Kittle that if he chose to join Foresight, FMI would enforce his non-compete, including through litigation. Given this, she advised him that he should consider whether he wanted to rescind his acceptance of Foresight's employment offer and remain employed by FMI until he could find non-competitive employment, and further encouraged him to speak with FMI's in-house counsel. Pizzonia asked Kittle to decide by 4 P.M. that day whether he intended to join Foresight so that FMI could take appropriate measures.

83. At 4:00 P.M., Kittle sent an email to Pizzonia confirming that he would pursue his anticipated role with Foresight. In response, Pizzonia advised Kittle that since he was leaving for a competitor, FMI had terminated his access to its systems, although he would be paid through February 5, 2025, which he had provided as his last day of employment with FMI.

84. In her email to Kittle, Pizzonia attached the Agreement and reminded Kittle of his obligations therein.

85. Unbeknownst to FMI, Kittle started working for Foresight on January 27, 2025, while still employed by, and receiving a paycheck from, FMI.

86. On information and belief, John Truesdell (who previously hired Kittle at FMI) is Foresight's Chief Business Officer. On information and belief, Truesdell hired Kittle, and was aware that Kittle was bound by the covenants in the Agreement at the time he extended an offer to Kittle.

87. Notably, when Truesdell initially left FMI in 2022, he joined a non-competitor, and only joined Foresight when his non-compete had expired a year later. On information and belief, Truesdell waited almost exactly one year to the day from leaving FMI, because (1) he is aware of FMI's non-compete obligations for employees in roles like his and Kittle's, (2) he is aware of the competitive overlap between FMI and Foresight, and (3) he is aware that FMI enforces its non-

compete agreements in situations such as this.

88. Indeed, just a few years ago, Truesdell was a critical FMI witness in a prior litigation against a former FMI employee who had joined another competitor, and his written declaration was key to the court's decision to enforce the former employee's non-compete and enjoin him from continuing in a competitive role.

89. Among other things, Truesdell's sworn declaration addresses FMI's legitimate business interests, the highly competitive landscape of the industry, and FMI's "great lengths" to protect its confidential information. For example, Truesdell's declaration notes that "FMI has spent years developing strategies to differentiate itself in the market to customers (and continues to do so). Over the years, FMI has compiled highly targeted and confidential information that has given it a distinct competitive advantage . . . ." Based on this, Truesdell expressed his concern about the former employee's similar role with the competitor, and his concern regarding the likelihood that the former employee would inevitably disclose (whether intentionally or otherwise) FMI's confidential information.

**<u>FMI's Attempts To Obtain Assurances From Kittle</u>**

90. Kittle's decision to join Foresight was very concerning to FMI, given the competitive overlap between the two companies as set forth above.

91. As a result, in addition to immediately terminating his access to FMI's systems and placing him on paid leave, FMI sent Kittle a letter through its outside counsel, reminding Kittle of his legal obligations to FMI, advising Kittle that his anticipated role with Foresight would violate those obligations, and demanding that Kittle confirm by no later than February 3, 2025 whether he intended to move forward with his anticipated Foresight employment. This letter also demanded that Kittle agree not to commence working for Foresight until FMI's concerns had been assuaged.

92. On February 3, 2025, counsel for Kittle responded to FMI's counsel. Her letter made no proposal regarding a potential resolution, and merely indicated that Kittle refused to rescind his Foresight acceptance. Notably, the letter from Kittle's counsel did not identify his anticipated start date with Foresight, despite FMI's demands.

93. That same day, February 3, 2025, FMI's counsel asked Kittle's counsel to identify Kittle's first day of employment with Foresight, and reiterated FMI's demand that he refrain from working for Foresight until the parties could attempt to resolve their dispute.

94. The following day, February 4, Kittle's attorney advised that Kittle had, in fact, started working at Foresight on January 27, the same day FMI had sent its cease and desist letter to him. Notably, Kittle was still employed and being paid by FMI at that time (and through February 5, the day that he had advised would be his last day with FMI).

**Irreparable Harm To FMI**

95. The information Kittle learned during his employment with FMI (including but not limited to information related to the MRD Pipeline Products and Incubator Lab Services that will compete directly with Foresight's products) and likely still remembers is highly proprietary, and would assist Foresight in competing unfairly, as set forth herein.

96. Given the companies' substantial competitive overlap, Kittle will not be able, even despite his best efforts, to avoid drawing on his knowledge and experience supporting FMI's competitive products and services, including using FMI's confidential information, developed at great expense and over years.

97. In light of the foregoing, Kittle's employment at Foresight represents a serious competitive threat to FMI's legitimate business interests, including protection of its confidential information and its goodwill.

98. Given the in-depth information Kittle had access to regarding FMI's products and services (both products already on the market and in FMI's pipeline), customer needs, roadmap, pricing, and more, on information and belief, Kittle cannot perform his job for Foresight without drawing upon the confidential information developed by FMI over his many years at FMI. Kittle will be involved in steering development of and marketing directly competitive products and necessarily seek to improve Foresight's offerings as they compete with FMI's products.

99. Accordingly, Kittle's employment with Foresight violates the Agreement. Unless Kittle is enjoined from working in a competitive capacity at Foresight, FMI will continue to face irreparable harm though loss of its confidential information and competitive edge.

## COUNT ONE
## Breach Of Contract

100. FMI repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

101. The Agreement is a valid and binding agreement supported by adequate consideration.

102. FMI has performed its obligations under the Agreement.

103. Under the terms of the Agreement, Kittle is precluded from providing competitive services to a FMI competitor during the Restricted Period.

104. The Agreement also prohibits Kittle from using or disclosing FMI's confidential information, other than in service of his role with FMI.

105. By accepting employment with Foresight in a competitive role, Kittle has breached the Agreement. This breach will continue if Kittle is allowed to work for Foresight in this role during the Restricted Period.

106. Additionally, Kittle's role at Foresight will cause him to inevitably disclose FMI's

confidential information in violation of the Agreement, even if he does not intend to do so.

107. The terms of the Agreement are reasonable for the protection of FMI's legitimate business interests. Kittle expressly acknowledged that the restrictions in the Agreement, including the restrictions on competition, are "necessary for the protection of the business and goodwill of the Company" and that he considered them "to be reasonable for such purpose." *See* **Exhibit 1**, § 8. He further acknowledged that an agreement not to disclose or use FMI's Confidential Information would be inadequate, standing alone, to protect FMI's legitimate business interests. *Id.*, § 6(a).

108. As a direct and proximate result of Kittle's breach of the Agreement with FMI, FMI will suffer irreparable harm, including damages in the form of disclosure of its confidential information. FMI will also suffer damages from Kittle's employment with Foresight in violation of the Agreement in an amount to be determined at trial.

**COUNT TWO**
**Breach of Duty of Loyalty**

109. FMI repeats and re-alleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

110. Under Massachusetts law, senior-level employees such as Kittle owe their employer a duty of loyalty and must refrain from competing with their employer during their employment.

111. Kittle was employed by FMI when he began working for Foresight in a competitive role on January 27, 2025.

112. By competing against FMI while still employed by FMI, Kittle breached the duty of loyalty he owed to FMI.

113. As a result of Kittle's breach of his duty of loyalty, FMI suffered harm in an amount

to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff FMI prays as follows:

A. That the Court enter judgment for FMI on all counts in the Complaint.

B. That the Court preliminarily and permanently enjoin Kittle:

i. For a period of one (1) year following the termination of his employment with FMI, from working for Foresight or any other FMI competitor in a competitive role;

ii. For a period of one (1) year following the termination of his employment, from soliciting any FMI client, customer, or employee;

iii. From retaining, using, disclosing, or disseminating to any third-party in any manner whatsoever, any of FMI's confidential information.

C. That the Court order Kittle to immediately return any FMI property still in his possession, custody, or control, and provide an accounting of any confidential information that he used or shared with any third party, including but not limited to Foresight;

D. That FMI be awarded actual, compensatory damages caused by Kittle's misconduct;

E. That FMI be awarded its reasonable attorneys' fees and costs; and

F. That the Court award FMI such other and further relief, both legal and equitable, as is warranted by the facts and the applicable law.

## JURY DEMAND

FMI hereby demands a trial by jury on all count of the Complaint so triable.

Dated: February 6, 2025

Respectfully submitted,

FOUNDATION MEDICINE, INC.

By its attorneys,

*/s/ Dawn Mertineit*

Dawn Mertineit (BBO# 669988)
Dallin R. Wilson (BBO# 676662)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: (617) 946-4800
Facsimile: (617) 946-4801
dmertineit@seyfarth.com
drwilson@seyfarth.com