**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FOUNDATION MEDICINE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CAMERON KITTLE,<br><br>Defendant. | Civil Action No. 1:25-cv-10298 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

Plaintiff Foundation Medicine, Inc. ("FMI") respectfully moves for an order enjoining Defendant Cameron Kittle ("Kittle") from violating his contractual obligations to FMI. Kittle is bound by a restrictive covenants agreement (the "Agreement") containing reasonable covenants designed to protect FMI's legitimate business interests, including a one-year post-termination non-compete that prohibits him from providing certain competitive services to a FMI competitor.

Kittle resigned from FMI to join Foresight Diagnostics ("Foresight"), a direct competitor, where he will be responsible for products that directly compete with the FMI products being developed, and about which he had access to highly confidential information. His role with Foresight not only violates his non-compete, but he will necessarily rely on confidential FMI information (whether he intends to or not). Despite FMI's offer to employ Kittle until he could find reasonable, non-competitive employment, Kittle refused to rescind his acceptance of a competitive role with Foresight. And while FMI agreed to pay Kittle through the end of his notice period ending on February 5, 2025, Kittle began working for Foresight without FMI's knowledge on January 27, *while still employed by FMI*, collecting two paychecks from competitors. FMI now seeks injunctive relief to enforce Kittle's covenants and protect FMI's legitimate business interests.

## I. <u>STATEMENT OF FACTS</u>

### A. <u>FMI's Business</u>

FMI is fundamentally changing the way in which cancer patients are evaluated and treated. FMI develops tests that capture relevant tumor, genomic, and other molecular information in an individual's disease and use clinical data to determine the best treatment. FMI's products and services provide genomic insights about each patient's individual cancer, enabling physicians to optimize treatments and biopharmaceutical partners to develop targeted therapies and immunotherapies effectively. Affidavit of Farida Peters-Abbadi ("Peters-Abbadi Aff."), ¶¶ 3-6.

Among other solutions, FMI is developing new molecular residual disease tests ("MRD

Pipeline Products”). MRD refers to the residual amount of circulating tumor DNA (“ctDNA”) remaining in a patient’s body after treatment, and is thus closely associated with disease recurrence. The existence of such ctDNA is typically apparent before current standard of care evaluations, such as standard imaging; MRD testing may thus lead to better patient outcomes by identifying the presence of disease with greater sensitivity than imaging alone, whether by indicating the need for treatment sooner than would otherwise be known, or by identifying specific treatment modifications to best target specific vulnerabilities in the remaining cancer cells. These highly sensitive MRD assays can also be used to monitor treatment progress in clinical cases where high sensitivity is required. FMI has released only limited information about its MRD Pipeline Products and has not even publicly announced the product names or specific launch dates. *Id.*, ¶ 7.

FMI has also recently launched incubator lab services which offer confidential research collaborations related to early-stage biomarkers and assays currently in development at FMI (“Incubator Lab Services), which allows FMI’s partners access to some of FMI’s biomarkers and assays that are still in development or early research. Many of these Incubator Lab Services are relevant (or may be relevant someday) to MRD Pipeline Products and may be helpful in improving MRD testing. To date, all promotional materials describing FMI’s most confidential Incubator Lab Services have only been approved for use along with a confidentiality disclosure agreement (“CDA”) and are labeled “Confidential-Do Not Distribute.” Furthermore, in contracting to provide Incubator Lab Services, FMI obligates its partners to keep confidential any information related to its assays, including the aforementioned Incubator Lab Services. *Id.*, ¶ 8.

FMI faces stiff competition from companies that offer competitive products, including those that relate to MRD. FMI’s success rests in substantial part on its development and ownership of confidential, proprietary information, which provides it with a distinct competitive advantage,

including but not limited to product development strategies, product roadmaps, product information including performance metrics, marketing strategies, and pricing. *Id.*, ¶¶ 8-12. FMI has devoted substantial time, effort, money, and other resources to the development, acquisition, maintenance, and protection of this information by, among other things, strictly restricting access to such information and requiring employees to sign restrictive covenants (including non-competes where permissible for those, like Kittle, with access to FMI's most sensitive information). FMI would not provide these employees with access to such information without their agreement to abide by these restrictive covenants. *Id.*, ¶¶ 13-16. FMI also has a rigorous review process, handled in part by FMI's Promotional Review Committee ("PRC"), for evaluating information prior to public disclosure as a further safeguard for protecting confidential information. Kittle was responsible for this process on his team, liaising with legal and other stakeholders to negotiate wording and finalize marketing claims in public materials. *Id.*, ¶ 17.[1]

**B. <u>Foresight's Competitive Offerings</u>**

Foresight is a direct competitor of FMI. Specifically, Foresight's website states that it "develops and delivers innovative diagnostic tests that combine precision genomics and cutting-edge bioinformatics to advance cancer drug development and patient care," just like FMI. Several third-party entities have identified Foresight and FMI as competitors. *Id.*, ¶ 20.

Like FMI, Foresight develops products and services focused on detecting ctDNA for the purposes of identifying MRD in solid tumors and lymphomas. *Id.*, ¶ 21. Its website states that its "products and services provide a comprehensive solution to academic and biopharma

[1] While FMI has released *extremely* limited information about its MRD Pipeline Products (and almost no publicly available information about its Incubator Lab Services), it retains an enormous amount of confidential information about these products that is shielded from public (and even internal) disclosure. Here, where the MRD Pipeline Products are still months away from launch, and Incubator Lab Services potentially years away from launch, the vast majority of information about these products is confidential and limited even within FMI. *Id.*, ¶¶ 18-19.

collaborators,[2] allowing access to both our circulating tumor DNA-based minimal residual disease (ctDNA-MRD) testing and our regulatory diagnostic expertise to optimize exploratory research, clinical trials, and diagnostic development programs." *See* https://foresight-dx.com/foresight-products-services/. Foresight appears to focus exclusively on MRD, and indeed all of the products and services mentioned on this page reference MRD.

**C. Kittle's Employment with FMI**

Kittle joined FMI in 2017 in a product management role, and was repeatedly promoted. Affidavit of Erin Pizzonia ("Pizzonia Aff."), ¶¶ 3-6. Most recently, in August 2023, Kittle was offered a promotion to Senior Director, BioPharma Marketing, and an associated 15% base salary increase, increase in target bonus, and eligibility for a long-term incentive award, all expressly conditioned on his execution of and agreement to abide by the covenants in the Agreement. *Id.*, ¶¶ 7, 10-13.[3] Kittle accepted the promotion by executing his promotion letter and the Agreement, and continued to accept the benefits thereunder until (and indeed, even after) his resignation. *Id.*, ¶ 14.

Kittle was responsible for developing key marketing strategies and tactics, resources, and execution for FMI's entire diagnostic products portfolio and pipeline to drive key business results. Kittle led cross-functional teams and initiatives, and was intimately familiar with FMI's products (including the MRD Pipeline Products), including their actual and potential use cases, performance metrics, competitive strengths (and weaknesses), and other confidential information, in order to successfully translate such knowledge into customer-facing marketing materials to generate growth for FMI. Kittle was also responsible for "objection handling," meaning anticipating and planning responses to client concerns ("objections") regarding FMI's products. As part of his

[2] These are notably the same sort of customers/collaborators FMI targets. Peters-Abbadi Aff., ¶ 21.

[3] Kittle's prior role on the product team was a necessary requirement of his new role in the BioPharma Marketing team. Peters-Abbadi Aff., ¶ 22; Pizzonia Aff., ¶ 8.

responsibilities for objection handling, Kittle had access to and discussed confidential information not shared with third parties absent an NDA. Peters-Abbadi Aff., ¶¶ 22-28.

Kittle's role was critical in shaping FMI's product strategy, working closely with FMI's innovation and new product teams to assess which product and market requirements will drive promotional plans. Kittle was aware of virtually every aspect of FMI's product offerings as well as its pipeline—including the MRD Pipeline Products and Incubator Lab Services. Indeed, Kittle recently participated in FMI's Marketing & Solutions annual planning for 2025. This process involved meeting with FMI Solution Leads responsible for every FMI solution (including the MRD Pipeline Products), who presented their plans and strategic imperatives for the coming year. Thus, Kittle had in-depth access to highly confidential product strategy. *Id.* ¶¶ 29-31.

Following a recent Foresight presentation at an industry conference regarding its MRD detection product, FMI opted to share certain limited information regarding the MRD Pipeline Products at a November 2024 summit. Kittle was primarily responsible for preparing this presentation, which initially contained a number of slides regarding the MRD Pipeline Products, including various charts and graphs with confidential data showing that FMI's MRD Pipeline Products compared favorably to the data presented by Foresight. However, as part of FMI's PRC process of reviewing information to be shared publicly to shield confidential information, Kittle was one of five FMI employees to discuss concerns regarding the level of detail initially included in the slide deck. Kittle was then directly responsible for stripping the presentation of confidential information and replacing it with a single slide containing extremely limited information. Notably, the resulting slide that was presented did not include FMI's name for the product or anticipated launch date (other than that it is expected in 2025). Instead, the slide merely identified the use case for the product in generic terms, discussing generally two types of MRD tests being considered

and what performance generally could be expected for sensitivity of those types of MRD tests based on early research. There were no *specific* performance metrics included in the slide related to the MRD Pipeline Products nor specifics about the individual MRD test types. *Id.*, ¶¶ 32-39.

Kittle also possesses highly confidential information about FMI's Incubator Lab Services, as he was responsible for developing promotional materials and marketing strategies related to those services. Kittle gained access to information regarding many of FMI's early research biomarkers and assays. In May 2023, Kittle was responsible for developing confidential promotional materials related to the Incubator Lab Services. These materials include references to biomarkers/algorithms which are not known outside of FMI without a duty of confidentiality, and were reviewed by FMI's PRC and approved for use only along with a signed CDA. They are also clearly labeled "Confidential – Do not distribute." These biomarkers/algorithms have not been disclosed outside of FMI without strict confidentiality obligations in place. *Id.*, ¶ 40.

In sum, Kittle had in-depth knowledge of FMI's products and product pipeline, including product definition, target audience, product requirements, performance specifications (including product sensitivity and specificity and biomarker development), the competitive landscape these products will compete with, pricing information, revenue forecasts, how the products compare to other products on the market, training materials, promotional and marketing materials, technical marketing plans, competitive and market insights, market research, and FMI's annual plans, biopharma strategy, business objectives, key results, and priorities for 2025. *Id.*, ¶ 41.

**D. <u>Terms Of The Agreement</u>**

Among other things, in exchange for his promotion and associated compensation and benefits, Kittle agreed that for one year after leaving FMI, he would not provide services to a

"Competing Organization,"[4] if such services involve the same or similar services he provided to FMI in the two years prior to leaving, or require or are likely to involve the use or disclosure of FMI's confidential information. *See* Agreement, Ex. 1 to Complaint, at § 6(d)(1). Kittle acknowledged that FMI's legitimate interests would not be adequately protected through his non-disclosure obligations alone, and that the Agreement's covenants were reasonable and necessary for FMI's protection. *Id.*, §§ 6(a), 8. Kittle agreed that he had been provided mutually-agreed upon, fair, and reasonable consideration in exchange for his non-compete obligations, including but not limited to eligibility for a long-term incentive grant, and his compensation and benefits associated with his new role. *Id.*, §§ 6(d)(3), 9(b); *see also* Promotion Letter, Ex. 2 to Complaint.

### E. <u>Kittle's Resignation From FMI</u>

In December 2024, Kittle asked FMI's in-house counsel if FMI pursued its non-compete agreements, and was told that it did; at that time, Kittle did not ask if FMI considered Foresight to be a competitor. Pizzonia Aff., ¶ 16. On January 22, 2025, Kittle announced his resignation from FMI effective February 5 to join Foresight in a "Lifecycle Management" role. Both Erin Pizzonia, FMI's Director, People Strategy Leader, and Troy Schurr, FMI's Chief Biopharma Business Officer, informed Kittle that his anticipated role with Foresight would violate his non-compete obligations. *Id.* ¶ 17. Pizzonia advised Kittle that if he chose to join Foresight, FMI would enforce his non-compete, including through litigation, and gave him the opportunity to rescind his acceptance with Foresight and remain employed by FMI until he could find non-competitive employment. *Id.*, ¶ 18. Kittle emailed Pizzonia confirming that he would pursue his anticipated

---

[4] "Competing Organization" is defined as entity that "develops, manufactures or markets any genomic profiling testing services or products, genomic data and information services or products, or other genomic services or products, in each instance in the field of oncology, that are competitive with the products or services that the Company has in existence or under development at the time of [Kittle's] employment or that are the subject of active planning at any time during [his] employment of which [he] ha[s] been made aware." *Id.*, § 6(d)(1).

role with Foresight; Pizzonia responded that FMI had terminated his access to its systems, but would honor his notice period, including providing compensation and benefits through that date. *Id.* ¶ 19. Pizzonia attached the Agreement and reminded Kittle of his obligations therein. *Id.*

A few days later, FMI again informed Kittle that his anticipated role with Foresight would violate his non-compete and necessarily cause him to divulge confidential information; this letter demanded that Kittle respond by February 3, and not start working for Foresight until FMI's concerns could be assuaged. Affidavit of Dawn Mertineit ("Mertineit Aff."), ¶ 4. Kittle responded through counsel, denying that his role would violate any enforceable covenant, but was notably silent about his start date. *Id.* ¶¶ 5-7, 11. When FMI's counsel requested confirmation that Kittle would not immediately start with Foresight, Kittle's counsel admitted for the first time on February 4 that Kittle had in fact joined Foresight more than a week earlier, without telling FMI—while he was still employed by and collecting a paycheck from FMI. *Id.* ¶¶ 11-12; Pizzonia Aff. ¶¶ 20-22.

### F. <u>Irreparable Harm</u>

The information Kittle learned during his employment with FMI (including information related to the MRD Pipeline Products that will compete directly with Foresight's products) is highly proprietary and would assist Foresight in competing unfairly. Given the companies' competitive overlap, as Kittle supports Foresight's products, he will not be able, even despite his best efforts, to avoid drawing on his experience supporting FMI's competitive products, including using FMI's confidential information, developed at great expense and over the course of years. In light of the foregoing, Kittle's employment at Foresight represents a serious competitive threat to FMI's legitimate business interests, and unless Kittle is enjoined from working in a competitive capacity at Foresight, FMI will continue to face irreparable harm. Peters-Abbadi Aff. ¶¶ 46-53.

## II. <u>ARGUMENT</u>

This court may issue injunctive relief if it finds: (1) a likelihood of success on the merits;

(2) a significant risk of irreparable injury absent an injunction; (3) the injury to FMI outweighs the harm to Kittle; and (4) an injunction will not adversely harm the public interest. *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 106 (D. Mass. 2024) (*aff'd*, 118 F.4th 416 (1st Cir. 2024)). The evidence is overwhelming that FMI will ultimately succeed on its claims and will suffer irreparable harm in the absence of an injunction, and the equitable and public considerations weigh in its favor.

## A. <u>FMI IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS</u>.

Of the foregoing factors, likelihood of success on the merits "normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 63, 66 (1st Cir. 2009). However, the Court "need not predict the eventual outcome on the merits with absolute assurance." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). A breach of contract requires a showing that "(1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

### 1. <u>The Agreement is Valid and Enforceable</u>.

Restrictive covenants are enforceable to the extent that they are "reasonable and necessary to protect the employer's legitimate interests while not interfering with ordinary competition." *IKON Off. Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999). Massachusetts courts enforce restrictive covenants if they are: (1) necessary to protect a legitimate business interest; (2) reasonably limited in time and geographic scope; and (3) consonant with the public interest. *See Automile Holdings v. McGovern*, 483 Mass. 797, 808 (2020). Additionally, non-compete agreements entered into on or after October 1, 2018 must comply with the Massachusetts Non-Competition Agreement Act (the "Act," G.L. c. 149, § 24L).

#### a. The Agreement Is Necessary To Protect FMI's Legitimate Interests.

The protection of goodwill, confidential information, and trade secrets are all widely

accepted as legitimate business interests served by restrictive covenants. *Automile Holdings,* 483 Mass. at 810; *Cynosure LLC v. Reveal Lasers LLC*, 2022 WL 18033055, *11, 115 (D. Mass. Nov. 9, 2022) (employer had "a legitimate interest in protecting its confidential information" from former employees with "detailed knowledge pertaining to [its] business strategies and logistics," including "marketing" and "strategy development;" granting one-year injunction throughout North America preventing former employees from accepting similar—but not identical—roles with a competitor); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass 1995) (former employer had legitimate interest in protecting against inevitable use of confidential information, including "aspects of the development and marketing" of products); *Nuance Comm'ns, Inc. v. Kovalenko*, 2022 WL 2347112, *5 (D. Mass. June 29, 2022) (same). The Agreement protects all of these interests; in fact, it states so on the face of the document. Agreement §§ 1, 6, 8. As noted above, FMI has devoted considerable resources developing its confidential information, has made reasonable efforts to protect the same from public disclosure, and derives value and a competitive advantage from such information not being generally known in the industry.

Kittle has suggested that his non-compete is unenforceable because FMI's legitimate business interests can be adequately protected by a lesser covenant. Mertineit Aff., ¶ 7. This argument is meritless. Even if Kittle intends to honor his confidentiality obligation, given the direct competitive overlap in his role with FMI and his current Foresight position (and the directly competitive products involved), it will be incredibly difficult, if not impossible, for him to work on Foresight's competing products without inevitably drawing upon the confidential information he recently had access to.[5] In fact, Kittle expressly agreed that his non-disclosure obligations

[5] Notably, Kittle's current boss and the person who hired him to join Foresight, ex-FMI employee John Truesdell, made this same statement under oath on FMI's behalf in a suit against another former FMI employee who had joined a competitor. Indeed, Truesdell was FMI's key witness in that suit, in which the court enforced the employee's non-compete. *Id*., ¶¶ 8-9.

"would be inadequate, standing alone, to protect [FMI]'s legitimate business interests, because some activities by a former employee who had held a position like [his] would, by their nature," compromise FMI's confidential information and goodwill. Kittle thus agreed that to protect against the irreparable harm that would result from such conduct—"whether or not intentional"—he would agree to and abide by his non-compete obligations. Agreement, §§ 6(a).

This refutes Kittle's current position, conveniently stated for the first time over a year later in a transparent attempt to avoid obligations to which he freely agreed. Less than a year ago, this Court held that where an employee acknowledged in his agreement that a non-compete was necessary to protect his employer's legitimate interests, the employee's subsequent argument that plaintiff's interests could be "protected by alternative covenants" (and thus the non-compete violated the Act) was unavailing. *See DraftKings*, 732 F. Supp.3d at 109-110. So too in *Cynosure*, where this Court rejected a similar argument, noting that where employees had access to confidential information including "marketing strategies and plans for future development":

> the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure. The problem for [the former employer] is that when [the former employee] goes to [the competitor] he does not go with *tabula rasa* with respect to [the former employer's] products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive how all of the information stored in [the former employee's] memory can be set aside as he applies himself to a competitor's business and its products.

2022 WL 18033055, *11-12 (citing *Marcam*, 885 F. Supp. at 297). *See also EMC Corp. v. Loafman*, 2012 WL 3620374 (Mass. Super. Ct. Aug. 20, 2012) ("as a general matter, enforcing a reasonable Non-Compete prevents erosion of confidentiality commitments, because human nature makes it unrealistic to expect [an individual] to put his confidential knowledge aside or to draw the necessary fine lines between protected information and general expertise").

**b. The Agreement Is Reasonably Limited In Scope.**

The non-compete in the Agreement is reasonably limited in scope and duration. Courts have consistently held, as a matter of law, that a twelve month restrictive period in a non-compete agreement is reasonable, and the Act likewise permits covenants up to a year. *See, e.g., Cynosure*, 2022 WL 18033055 at *17; *DraftKings*, 732 F. Supp.3d at 121; G.L. c. 149, § 24L(b)(iv).

The geographic scope of the Agreement is also reasonable. "[E]ven in the employment context, large geographic areas are deemed reasonable in some circumstances." *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 644 (2004); *see also Advanced Cable Ties, Inc. v. Hewes*, 2006 WL 3292810, *2 (Mass. Super. Ct. Oct. 19, 2006) (lack of geographic limit did not preclude national enforcement of restrictive covenant). Nationwide restrictive covenants have routinely been upheld in circumstances similar to those present here. *See Rentex, Inc. v. Franco*, 2018 WL 4309330, at *4 (Mass. Super. Ct. July 16, 2018) (nationwide geographic area was "not too broad because the evidence presented establishes that [plaintiff] actually does business around the country"); *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439-40 (D. Mass. 2010) (same). Because FMI conducts business throughout the United States and markets its products around the country (and indeed, beyond), the geographic scope of the Agreement is reasonable. Indeed, Kittle's responsibilities for FMI were not geographically limited, and the confidential information to which he was exposed could be exploited regardless of where he works for Foresight. *Nuance Commn's*, 2022 WL 2347112, *6 (where, like Kittle, employee's responsibilities "were not geographically limited," "[n]ationwide enforcement of the Agreement is, therefore, reasonable"); *Loafman*, 2012 WL 3620374 ("The idea of a geographic restriction in a market that competes on a global basis would make little sense.").

This Court recently upheld a similar non-compete in *DraftKings*, finding that the one-year prohibition on providing similar services to a competing business was "reasonably tied" to the

employer's "interest in protecting its confidential information and trade secrets" and enforcing the covenant nationwide. 732 F. Supp.3d at 110. In fact, the Act deems a geographic scope that coincides with the area in which an employee "provided services or had a material presence or influence"—as is the case with the Agreement, which uses this precise phrase to define the "Restricted Territory"—to be "presumptively reasonable." G.L. c. 149, § 24L(b)(v).

Finally, the scope of conduct proscribed is likewise reasonable, as it only prohibits Kittle from providing the same or similar services as those he provided for FMI in the last 2 years, or services that would likely involve the use or disclosure of FMI's confidential information; in other words, Kittle is not prohibited from working for a competitor in *any* capacity.

**c. The Agreement Is Consonant With Public Policy.**

Employers have a right to protect trade secrets, confidential information, and goodwill, and "[t]he public has an interest in the enforcement of valid contracts." *Nuance Commn's*, 2022 WL 2347112 at *7 (citing *Lombard Med. Techs.*, 729 F. Supp. 2d at 443); *Boulanger*, 442 Mass. at 646 (rejecting the argument that non-compete covenants harm the public interest in liberty of employment); *G&L Plumbing, Inc. v. Kibbe*, 699 F. Supp. 3d 96, 109–10 (D. Mass. 2023) ("there is a federal policy and a policy of the Commonwealth of Massachusetts to offer strong protection for trade secrets"). Nothing in the Agreement prevents Kittle from continuing to work in another industry or for a company that sells non-competitive products. In fact, FMI offered to let Kittle remain an FMI employee until he could find an appropriate, non-competitive role with another employer; he refused. Because "the Agreement does not prevent [Kittle] from working but only from providing services to a Competitor that would involve" conflicting business activities, enforcement "is consistent with the public interest." *Nuance Commn's* at *7 (cleaned up).

**d. The Agreement Complies with the Act**

Kittle has suggested the Agreement does not satisfy the requirements of the Act; this claim

is also meritless. The Act requires that a non-compete signed after commencement of employment:

> (i) must be in writing, be signed by employer and employee, and state that the employee has the right to consult with counsel before signing; (ii) must "be supported by fair and reasonable consideration independent from the continuation of employment" . . . and provide the employee with ten business days' notice before becoming effective; (iii) must "be no broader than necessary to protect" the employer's trade secrets, confidential information, or goodwill, each of which constitute "legitimate business interests"; (iv) may not exceed twelve months from the last day of employment . . . ; (v) must "be reasonable in geographic reach in relation to the interests protected"; (vi) must "be reasonable in the scope of proscribed activities in relation to the interests protected"; (vii) must "be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee"; and (viii) must be "consonant with public policy."

*See DraftKings*, 732 F. Supp.3d at 109 (citing the Act and listing the eight requirements); *Cynosure*, 2022 WL 18033055 at *9 (non-competes complied with the Act where they were in writing, supported by consideration distinct from continued employment, advised of the right to consult counsel, did not exceed 1 year post-termination, and provided "mutually-agreed upon consideration"). Many of these requirements codify pre-existing Massachusetts common law and are already addressed above. The Agreement satisfies all of these requirements.

Kittle's claim that the Agreement is not supported by mutually-agreed upon consideration fails. The Agreement is attached to Kittle's Promotion Letter, which explicitly states that Kittle's promotion and associated increase in compensation and benefits were contingent on his execution of the Agreement. *See* Complaint Ex. 2. Additionally, the Agreement itself references this consideration—including Kittle's "eligibility for a long-term incentive grant for which [he] would otherwise not be eligible, in addition to [his] continued employment with the Company, [his] compensation and benefits associated therewith . . . and [his] eligibility to participate in other equity, commission and/or bonus programs," all of which he agreed was "fair and reasonable" consideration. Agreement, § 9(b). Indeed, by virtue of Kittle's execution of the Agreement, his base salary increased by 15% or $30,000, his bonus eligibility increased by 30% (and he received

a bonus of nearly $50,000 as a result, more than he would have been entitled to absent execution of the Agreement), and his long-term incentive grant target nearly doubled, from 42% to 75% of his base salary. Kittle would not have been eligible for any of these increases absent his execution of the Agreement and agreement to be bound thereby. Pizzonia Aff. ¶ 13. He was aware of this fact, executed the Agreement, and accepted the foregoing consideration. He cannot now complain that the Agreement is not supported by sufficient consideration beyond continued employment.

**2. <u>Kittle Has Breached The Agreement.</u>**

Kittle has breached the Agreement by working in a competitive role at Foresight, a Competing Organization that directly competes with FMI with respect to genomic diagnostic testing in the MRD space (and Foresight appears to focus *only* on such products). Tellingly, Kittle's response to FMI's cease and desist letter did not deny that his Foresight role requires him to perform substantially similar services as those he recently performed for FMI, involving competing products; Kittle's response to the cease and desist letter merely argued that the non-compete is unenforceable (which is refuted as addressed above) and that he has "no meaningful FMI confidential information," which is refuted by FMI's accompanying declarations. *See* Mertineit Aff. ¶¶ 7, 10; *see generally* Peters-Abaddi Aff.[6] Any attempt to deny he is in breach fails.

Given the overlap in Kittle's role with Foresight and the work he most recently performed for FMI, Kittle will necessarily use confidential information obtained during his employment with FMI (whether he intends to or not). *See, e.g., Cynosure*, 2022 WL 18033055 at *10 (while new roles were not "exactly the same," there was sufficient overlap that defendants' new roles were

[6] *See also Lombard Med. Techs.*, 729 F. Supp. 2d at 442 ("the Court finds it difficult to believe that . . . [defendants] did not pick up *any* confidential or proprietary information" where they were "intimately familiar with the weaknesses" in plaintiff's product and were "knowledgeable about Lombard's non-public clinical trial analyses . . . . it is difficult to conceive how all of the information stored in their memory can be set aside as they apply themselves to a competitor's business and its products.") (cleaned up; emphasis in original).

"likely to involve the use of proprietary information," justifying an injunction throughout North America). Indeed, in *Nuance Commn's*, this Court noted that considering the former and new employers' "overlapping product functionalities, Nuance ha[d] satisfied its burden" of establishing that defendant's new role could put its confidential information at risk, and thus plaintiff was likely to prevail on merits of breach of non-compete claim—particularly where defendant's new role included responsibilities such as "ensuring effective cross-functional collaboration and strategy execution" with various teams, including marketing, to "ensure successful future launch of [relevant products], while identifying new products and opportunities"). 2022 WL 2347112 at *9 and n.2. The same is true here. *See* Peters-Abbadi Aff., ¶ 47.

### 3. <u>FMI Has Suffered, or Will Suffer, Damages.</u>

Kittle's actions have damaged FMI's legitimate business interests and have denied FMI the benefit for which it bargained. Absent a temporary restraining order and a preliminary injunction enforcing the Agreement, Kittle stands to irreparably damage FMI's product strategy and compromise its confidential information and goodwill by working for a direct competitor and exploiting his unique knowledge of FMI's business. Kittle's breach of the Agreement will undoubtedly result in financial loss to FMI (if it hasn't already), which will increase as long as Kittle is permitted to work for Foresight in a competitive role.

For the foregoing reasons, FMI is likely to succeed on its breach of contract claim.

## B. <u>FMI WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION</u>.

FMI will suffer irreparable harm if Kittle is permitted to continue violating the Agreement by working for Foresight, which will cause him to utilize, without authorization, FMI's confidential information acquired via his employment with FMI (even if he does not intend to).

To prove irreparable harm sufficient to warrant injunctive relief, FMI need only demonstrate a "substantial injury that is not accurately measurable or adequately compensated by

money damages." *Ross–Simons of Warwick*, 102 F.3d at 18–19. "Massachusetts courts have generally recognized, in the context of restrictive covenants, that the 'task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one.'" *Nuance Commn's*, 2022 WL 2347112 at *10 (citing *Oxford Glob. Res., Inc. v. Guerriero*, 2003 WL 23112398, at *11 (D. Mass. Dec. 30, 2003)); *New England Controls, Inc. v. Pilsbury*, 2018 WL 3150223, at *7 (D. Mass. June 27, 2018) (disclosure of confidential information "often lead[s] to damage that 'would be practically impossible to calculate.'") (citations omitted). Indeed, less than a year ago, this Court noted that "[a] finding of irreparable harm is . . . triggered where the defendant has likely violated his noncompetition agreement," particularly where (as here) the employee acknowledged that a breach of the noncompete would result in "irreparable harm for which monetary damages are inadequate." *DraftKings*, 732 F. Supp.3d at 120.[7]

Furthermore, "a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm." *Harlan Labs., Inc. v. Campbell*, 900 F. Supp. 2d 99, 108 (D. Mass. 2012); *Avaya, Inc. v. Ali*, 2012 WL 2888474, at *8 (D. Mass. July 13, 2012) (same). Equitable relief is necessary in such circumstances because "once the confidential information is in the hands of a competitor . . . there is no way to make it confidential again." *Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 778 (D. Mass. 1994); *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929, at *1 (D. Mass. June 4, 1996) (stating that it is "almost impossible to measure [a defendant's] damage . . . [i]f confidential information is allowed to be revealed.").

Here, FMI faces the threat of immediate and irreparable harm if Kittle is not enjoined from violating the Agreement and using (intentionally or otherwise) its proprietary information. In

[7] *See also Washington Trust Advisors, Inc. v. Arnold*, 646 F. Supp.3d 210, 220-21 (D. Mass. 2022) ("Massachusetts courts . . . have generally enforced" contractual acknowledgements regarding irreparable harm).

supporting products that compete directly with the FMI products he supported just weeks ago, Kittle will necessarily draw on that experience and exploit his knowledge of FMI products to the benefit of Foresight, a direct competitor. The use of confidential information related to FMI's competitive products—information developed and refined at FMI's expense over a period of years—represents a serious competitive threat to FMI's legitimate business interests moving forward. This Court agreed in *Nuance Commn's*, holding that:

> given the extent of [defendant's] experience at Nuance, and the apparent similarity between her positions at Nuance and [her new employer], it is difficult to conceive how all of the information stored in [her] memory can be set aside as she applies herself to a competitor's business and its products. On the contrary, what [she] knows about Nuance is bound to influence what she does for [her new employer], and to the extent it does, Nuance will be disadvantaged.

2022 WL 2347112, *10 (cleaned up; citing *Aspect Software, Inc. v. Barnett*, 787 F. Supp.2d 118 (2011)). The Court specifically recognized the irreparable harm that plaintiff would face if defendant "were to use her substantial knowledge of [plaintiff's] confidential information in directing development of [a competitor's] competing products." *Id.* The same is true here.

In sum, Kittle's employment with Foresight not only violates the Agreement, but it will require him to use confidential and proprietary business information obtained while working at FMI, even if he has the best of intentions. None of the foregoing harm would have arisen but for Kittle's breach of the Agreement, and none of it can be adequately mitigated in the absence of injunctive relief. Accordingly, an injunction is necessary to prevent irreparable harm to FMI.

### C. <u>THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF FMI</u>

While FMI will suffer substantial, irreparable harm without an injunction, the harm to Kittle would be minimal. Enjoining Kittle from complying with his obligations under the Agreement would merely force him to do what he already agreed to do, in exchange for fair and mutually agreeable consideration to which he admitted he would otherwise not be entitled. Nor

would it prevent Kittle from continuing to work in another industry or for a company that does not provide products or services that compete with FMI; indeed, FMI immediately offered to retain Kittle until he could find an appropriate, non-competitive role, so that he would not be harmed in the meantime. Kittle refused this reasonable offer, which FMI was not obligated to make.

To the extent that Kittle suffers any damage from the injunctive relief, "this harm is a predictable consequence" of his breach. *DraftKings*, 732 F. Supp.3d at 120 (cleaned up; citing *Nuance Comm'ns*, 2022 WL 2347112, at *10); *Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 203 (D. Mass. 2016). The harm to employees is "the consequence of enforcing any covenant to compete and that fact alone does not make such covenants unenforceable." *DraftKings*, 732 F. Supp.3d at 120 (cleaned up). *See also Cynosure*, 2022 WL 18033055, at *15 (while many of defendants were the primary breadwinners for their families, they "all made near or over six figure salaries," and the covenants were limited in duration and did not prevent them "from earning a living in adjacent fields;" balance of hardships thus favored enforcing non-competes). Here, Kittle's overall compensation between base salary, bonus, and long-term equity grant in 2024 alone were worth over $430,000.

Moreover, enforcing the Agreement would not keep Kittle out of work entirely; instead, his Agreement is limited, just as the *DraftKings* non-compete was. That latter agreement, this Court found, was "qualified: it prevents [defendant] from providing services to a Competing Business that relate to any aspect of DraftKing's business *for which he performed services or received Confidential Information.*" 732 F. Supp.3d at 121 (cleaned up; emphasis in original); *see also Nuance Commn's*, 2022 WL 2347112 at *10 (enjoining defendant from working for competitor "will not prevent her from working in a different industry or for an employer that does not provide products or services that compete with Nuance"). The same is true here, and thus this

Court should enforce the Agreement just as in *DraftKings* and *Nuance Commn's*.

## D. THE PUBLIC INTEREST WILL NOT BE ADVERSELY AFFECTED

Injunctive relief will serve the public interest by upholding valid contracts and prohibiting Kittle from unlawfully using FMI's confidential information. An employer has a right to protect its trade secrets, confidential information, and goodwill. *Edwards v. Athena Capital Advisors, Inc.*, 2007 WL 2840360, *6 (Mass. Super. Ct. Aug. 9, 2007); *Lombard Med. Techs.*, 729 F. Supp. 2d at 443 ("The public has an interest in the enforcement of valid contracts."); *Nuance Commn's*, 2022 WL 2347112, *11 (same); *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929 at *3 ("It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged."). Indeed, there is a public policy "favoring the protection of trade secrets," and it is "beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *DraftKings*, 732 F. Supp.3d at 121.[8]

Kittle "knowingly chose to assume the risk of going to work for a competitor without waiting the requisite time . . . ." *Cynosure*, 2022 WL 18033055 at *16 (cleaned up). Nothing in the requested relief will have any adverse effect on the public interest.

## CONCLUSION

For the foregoing reasons, FMI respectfully asks the Court to grant its motions for a temporary restraining order and preliminary injunction.

[8] Kittle's claim that it is in the public interest to permit him to work for a cancer company, Mertineit Aff. ¶ 7, fails. Kittle's desires, while laudable, cannot overcome the public interest in protecting confidential information. If companies like FMI or Foresight were unable to protect their proprietary information through valid non-competes, they would be far less likely to devote the resources to such treatments. This would significantly impact the public interest, far more than prohibiting Kittle from providing competitive services to Foresight.

Dated: February 7, 2025

Respectfully submitted,

FOUNDATION MEDICINE, INC.

By its attorneys,

*/s/ Dawn Mertineit*

Dawn Mertineit (BBO# 669988)
Dallin R. Wilson (BBO# 676662)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane
Suite 1200
Boston, MA 02210-2028
Telephone: (617) 946-4800
Facsimile: (617) 946-4801
dmertineit@seyfarth.com
drwilson@seyfarth.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing ("NEF"), and copies will be served by email to all non-registrants (including Attorney Margaret Pinkham, counsel for Defendant Kittle).

*/s/ Dawn Mertineit*
Dawn Mertineit