**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FOUNDATION MEDICINE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CAMERON KITTLE,<br><br>Defendant. | Civil Action No. 1:25-cv-10298 |

**AFFIDAVIT OF FARIDA PETERS-ABBADI IN SUPPORT OF PLAINTIFF FOUNDATION MEDICINE, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Farida Peters-Abbadi, do hereby depose and state as follows:

1. I am Vice President, Marketing & Solutions, for Plaintiff Foundation Medicine, Inc. ("FMI"). I have been employed by FMI since November 2023.

2. I submit this affidavit in support of FMI's motions for a temporary restraining order and a preliminary injunction against the defendant, Cameron Kittle ("Kittle"). This affidavit is based upon my personal knowledge and/or my review of FMI records.

**FMI's Business**

3. FMI is a molecular information company focused on fundamentally changing the way in which patients with cancer are evaluated and treated. FMI aims to simplify the complex nature of cancer genomics, bringing cutting-edge science and technology to everyday cancer care, using best-in-class products and services that empower the work of physicians, researchers, and all those engaged in the fight against cancer globally.

4. FMI harnesses next-generation sequencing and other advanced technologies to develop clinical laboratory tests that broadly capture relevant tumor, genomic, and other molecular information in an individual's disease and connect it with a knowledge base of relevant clinical

data used by oncologists to determine the best treatment.

5. FMI derives revenue from selling products and services that are enabled by its molecular information platform to physicians and biopharmaceutical partners throughout the world.

6. FMI's products and services provide genomic insights about each patient's individual cancer obtained from that analysis, enabling physicians to optimize treatments in clinical practice and biopharmaceutical partners to develop targeted therapies and immunotherapies more effectively.

7. Among other monitoring products and services, FMI is currently developing one or more new molecular residual disease tests ("MRD Pipeline Products"). MRD is an industry term used to refer to the residual amount of circulating tumor DNA ("ctDNA") that remains in a patient's body after treatment (e.g., surgery or therapeutic treatment) and is accordingly closely associated with disease recurrence or relapse in patients. The existence of such ctDNA is typically apparent before current standard of care evaluations, such as standard imaging. It is hypothesized that MRD testing can lead to better patient outcomes by identifying the presence of disease with greater sensitivity than imaging alone, whether by indicating the need for additional treatment sooner than would otherwise be identified, or by identifying specific treatment modifications that will best target specific vulnerabilities in the remaining cancer cells. Additionally, these highly sensitive MRD assays can be used to monitor treatment progress in clinical cases where high sensitivity is required, such as neo-adjuvant treatment in early-stage disease. FMI has released only limited information about its MRD Pipeline Products and has not even publicly announced the product name or specific launch date.

8. Additionally, FMI has recently launched incubator lab services which offer

confidential research collaborations related to early-stage biomarkers and assays currently in development at FMI (hereinafter "Incubator Lab Services). These services allow FMI's partners access to some of FMI's biomarkers and assays that are still in development or early research. Many of these Incubator Lab Services are relevant (or may be relevant someday) to the MRD Pipeline Products and may be helpful in improving MRD testing. Much like the MRD Pipeline Products, FMI has gone to great measures to only disclose extremely limited information about the Incubator Lab Services. In fact, to date, all promotional materials describing FMI's most confidential Incubator Lab Services have only been approved for use along with a confidentiality disclosure agreement ("CDA") and are labeled "Confidential-Do Not Distribute." Furthermore, in contracting to provide Incubator Lab Services, FMI obligates its partners to keep confidential any information related to its assays, including the forementioned Incubator Lab Services.

**FMI's Confidential Information and Goodwill**

9. FMI maintains a legitimate business interest in its confidential and proprietary information, customers, and goodwill, including its employees' access to and knowledge of confidential information.

10. FMI faces stiff competition from companies that offer competitive products. Comprehensive genomic profiling in the oncology space, and especially in the MRD space, is a relatively new area of science, with new, cutting-edge advancements and discoveries being made continually.

11. FMI has been a critical contributor to advancements in genomic profiling as well as other multiomic profiling such as epigenetics, transcriptomics, and fragmentomics—all of which could very well play a critical role in identifying the presence of disease at lower levels. As a result, there is a significant amount of research and data available at FMI that could be beneficial

to its competitors developing MRD testing. FMI's confidential information is thus valuable because it provides FMI with a distinct competitive advantage, and given that the nature of the industry is highly competitive, with extremely narrow bands of competitors (particularly in the MRD space), the confidential information has independent economic value to FMI because it is not known to others.

12. FMI's success rests in substantial part upon its development and ownership of certain trade secrets and other confidential, proprietary information. FMI's confidential information includes, but is not limited to, FMI's product development strategies, product roadmaps, product information including performance metrics, marketing strategies, and pricing, among other things.

13. To gain a foothold in the market and drive success of its products, FMI has spent years developing new products and technologies, as well as strategies to market such products to customers, which work continues to this day. FMI has thus compiled highly targeted and confidential information that gives it a leg up in the industry.

14. FMI has devoted substantial time, effort, money, and other resources to the development, acquisition, maintenance, and protection of its confidential information by, among other things, restricting access to such information, requiring all content be reviewed by the appropriate committees before disclosure outside FMI, and requiring employees to sign confidentiality agreements and other restrictive covenants. All FMI employees are required, as a condition of their employment, to agree to confidentiality obligations.

15. Additionally, FMI employees with access to its most sensitive information, like Kittle, are required to execute non-competes (where legally permissible), and acknowledge that an obligation not to disclose FMI's trade secrets, alone, would be insufficient to protect FMI's

legitimate business interests. FMI would not provide these employees with access to such confidential information without their agreement to abide by these restrictive covenants.

16. In addition, all of FMI's computers that are distributed to its employees are password protected and encrypted. FMI's confidential information is also kept in secure repositories, and FMI carefully restricts access to its confidential information so that only those employees with a legitimate "need to know" can access the same through password protected systems.

17. FMI also has a rigorous review process for evaluating any information prior to public disclosure as a further safeguard for protecting confidential information. This process is handled in part by FMI's Promotional Review Committee ("PRC"). In addition to protecting confidential information from leaving FMI unintentionally, review of content by PRC ensures that FMI is compliant with applicable laws and regulations, minimizes or avoids financial and reputational harm, and ensures accuracy and scientific soundness of materials, as well as consistency of company messaging and brand guidelines. Kittle was responsible for this process on his team, liaising with Medical, Legal, Regulatory and Compliance stakeholders to negotiate wording and finalize marketing claims in public-facing promotional materials.

18. While FMI has released some *extremely* limited information about its forthcoming MRD Pipeline Products and almost no publicly available information about its Incubator Lab Services, it retains an enormous amount of confidential information about these products that has been developed through significant time and expense, and FMI has taken great pains to shield this information from public disclosure (and even internal disclosure, for employees that do not have a need to know this information). For example, as mentioned above, FMI has only approved promotional materials describing the most sensitive and confidential Incubator Lab Services for

use under a CDA, and has labeled those materials accordingly.

19. Even as to its fully commercialized products that are already on the market, FMI—like most companies, in my experience—maintains highly confidential information that is closely guarded and not widely known, either externally or even internally beyond those with a business need to know. Here, where the MRD Pipeline Products are still months away from launch, or in the case of services from the Incubator Lab, potentially years away from launch, the vast majority of information about these products is confidential and limited even within FMI.

**<u>Foresight's Competitive Offerings</u>**

20. Foresight Diagnostics ("Foresight") is a direct competitor of FMI. Foresight's website states that it "develops and delivers innovative diagnostic tests that combine precision genomics and cutting-edge bioinformatics to advance cancer drug development and patient care," just like FMI. Several third-party entities have identified Foresight and FMI as competitors.

21. Similar to FMI's planned MRD Pipeline Products, Foresight offers products and services focused on detecting ctDNA for the purposes of identifying MRD. As I understand it and based on its website, Foresight focuses almost entirely on MRD detection and analysis and targets the same sort of customers and collaborators FMI targets.

**<u>Kittle's Employment with FMI</u>**

22. I supervised Kittle from my start at FMI until his recent resignation. I understand that Kittle previously had a role with FMI's product team, which was a necessary background for his involvement in the Marketing & Solutions team. More specifically, I understand that Kittle's deep knowledge of how FMI develops its products, product strategy, go-to-market plans, and execution of such strategies and plans was a necessary requirement of his new role in the BioPharma Marketing team.

23. In his latest role as Senior Director, Kittle was responsible for developing key marketing strategies and tactics, resources, and execution for FMI's entire diagnostic products portfolio as well as its pipeline in American and worldwide markets to drive key business results. As part of his role, Kittle was required to lead cross-functional teams and initiatives, including key message development, marketing resource development, multi-channel integration of key content assets, and launch planning for products and services.

24. FMI's customers and business partners (and prospective customers and business partners) are located not only all around the country, but worldwide. In Kittle's role with FMI, he performed services and had a material presence not in a limited geographic region, but rather worldwide.

25. Kittle was also required to be intimately familiar with FMI's products (including pipeline products not yet released or commercialized, such as the MRD Pipeline Products). This included being familiar with their actual and potential use cases; performance metrics, which includes, for example, an assay's detection rate (i.e. false negative rate and/or false positive rate, and predictive values) based on clinical data generated by a validation and/or verification study, thus requiring Kittle to understand such clinical evidence to formulate accurate marketing claims and generate associated proof points substantiating such claims; competitive strengths (and weaknesses); and other confidential information, in order to successfully translate such knowledge into customer-facing marketing materials to generate growth for FMI. In this respect, FMI's marketing is more than mere "advertising gimmicks" or "sales techniques."

26. Kittle was also responsible for "objection handling," which is an industry term FMI uses to describe how it anticipates how best to respond to customers' or prospects' concerns (or "objections") regarding FMI's products. For example, if a potential customer were to state that

another company's competitive product works better or was easier to use, FMI would have appropriate responses pre-vetted to compare its products favorably.

27. As part of his responsibilities for objection handling, Kittle was required to know the possible objections customers or prospects might have, and how to combat them—which included having access to and discussing confidential information that was not shared with third parties absent a non-disclosure agreement. Prior to my start at FMI, Kittle also supervised BioPharma's Training other FMI employees on product knowledge as well as objection handling.

28. Kittle's other responsibilities included:

a. Leading the development and articulation of key product portfolio insights into marketing execution;

b. Focusing on product management and development, ensuring alignment with customer needs and market demands;

c. Collaborating with key internal and external stakeholders (and considering external demands) to ensure strategic co-development and subsequent alignment on strategy and positioning of diagnostic products within FMI's portfolio;

d. Developing pitch-decks, presentations, and other marketing and training tools that effectively communicate FMI's value proposition to customers;

e. Partnering with marketing team members to ensure that messaging and tactics align with strategic plans;

f. Ensuring marketing strategy and materials effectively reflect FMI's messaging and brand identity;

g. Partnering with and supporting customer-facing teams and cross-functional partners (including teams responsible for product launch) to create, identify, plan,

and execute key strategy and align business goals with FMI's product and service offerings;

h. Leading and managing market research and customer intelligence efforts; and

i. Leveraging competitive insights to inform strategy and refine messaging.

29. Kittle's role was critical in shaping FMI's product marketing strategy, as he and his direct reports in the marketing team worked closely with FMI's innovation and new product teams to assess which product and market requirements will drive promotional plans.

30. In this role, Kittle was aware of virtually every aspect of FMI's product offerings as well as its pipeline—including the MRD Pipeline Products and Incubator Lab Services.

31. Kittle recently participated in FMI's Marketing & Solutions annual planning for 2025, which began in November 2024 and continued into December. This process involved meeting with FMI Solution Leads, who are responsible for every FMI product or solution (including pipeline products such as the MRD Pipeline Products), who presented their plans and strategic imperatives for the coming year. Kittle thus had in-depth access to highly confidential product strategy.

32. In recent months, Kittle interacted with FMI's CEO regarding, among other things, the marketing for the MRD Pipeline Products, including being intimately involved in preparing a presentation regarding proposed customer outreach for these products. Kittle also worked hand-in-hand with FMI's development team on the timeline of the product launch.

33. As an example, in direct response to Foresight's presentation on September 14, 2024 at the European Society for Medical Oncology (ESMO) Congress regarding the improved sensitivity of its MRD detection product, Foresight CLARITY™, FMI determined that it needed to begin sharing certain information regarding its forthcoming MRD Pipeline Products, which

compared favorably to the data reported by Foresight. I understand that Kittle was directly involved in these discussions.

34. FMI decided to release certain limited information regarding the MRD Pipeline Products at the Liquid Biopsy Surveillance Summit (the "LBS Summit"), which took place on November 21-22, 2024 in Boston. Kittle was primarily responsible for preparing this presentation.

35. Initially, the slide deck that was prepared for the LBS Summit contained a number of slides regarding the MRD Pipeline Products, including various charts and graphs with confidential data. However, as part of FMI's normal procedure of reviewing information to be shared publicly to ensure that any confidential information is withheld (a process undertaken by PRC), FMI employees revised the slide deck repeatedly, until the presentation contained a single slide regarding the MRD Pipeline Products, with only high-level detail.

36. Specifically, I am aware that a senior FMI employee invited four other FMI employees—including Kittle—to a November 8, 2024 meeting to discuss his concerns regarding the level of detail initially included in the slide deck. I understand that Kittle attended this meeting, and on November 11, emailed the same group with a revised deck that he had stripped of confidential information, which limited the MRD Pipeline Products information to a single slide containing extremely limited information.

37. The slide that was ultimately presented at the LBS Summit did not include FMI's name for the product or anticipated launch date (other than that it is expected in 2025). Instead, the slide just identified the use case for the product in generic terms. In particular, the slide discussed generally two types of MRD tests being considered and what performance generally could be expected for sensitivity of those types of MRD tests based on early research. There were no *specific* performance metrics included in the slide related to the MRD Pipeline Products, nor

specifics about the individual MRD test types. Only the "likely" performance FMI could expect to see based on early research was included in the slide.

38. I am familiar with the foregoing based not only on my regular discussions with Kittle at the time he was involved in this process and revising the presentation, but also based on my review of FMI documents and conversations with other FMI employees who were directly involved in this process with Kittle.

39. I understand that Kittle has suggested that FMI previously disclosed its "MRD prototypes." This is not true. At most, FMI has revealed a limited "sneak peek" of what MRD prototypes it was considering, only using high-level, generalized information related to the anticipated use case and vague 2025 release.

40. Additionally, as mentioned above, Kittle possesses highly confidential information about FMI's Incubator Lab Services. As part of his role, Kittle was responsible for developing promotional materials and marketing strategies related to FMI's Incubator Lab Services. As part of developing these promotional materials and marketing strategies, Kittle gained access to information regarding many of FMI's early research biomarkers and assays. In May 2023, Kittle was responsible for developing confidential promotional materials related to the Incubator Lab Services. These materials include references to biomarkers/algorithms which are not known outside of FMI without a duty of confidentiality, and were reviewed by FMI's PRC and approved for use only along with a signed CDA. They are also clearly labeled "Confidential – Do not distribute." These biomarkers/algorithms had not been disclosed outside of FMI at that time without strict confidentiality obligations in place.

41. In sum, Kittle recently had access to detailed, highly confidential information that has specifically been excluded from the public domain, given the legitimate concerns about

disclosure of such information, particularly to FMI competitors like Foresight. He had in-depth knowledge of FMI's products and product pipeline, including but not limited to product definition, target audience and segments, product requirements, performance specifications (including product sensitivity and specificity and biomarker development), the competitive landscape that these products will compete with, pricing information, revenue forecasts, how the products compare to other competitive products on the market, training materials, promotional and marketing materials, technical marketing plans, competitive and market insights, market research, and FMI's annual plans, biopharma strategy, business objectives, key results, and priorities for 2025.

42. Based on Kittle's in-depth knowledge of FMI's confidential information, he was required to agree to a restrictive covenants agreement (the "Agreement"). The covenants in the Agreement—including his non-compete—are reasonable and necessary to protect FMI's legitimate business interests, because the confidential information Kittle had access to would be incredibly valuable to a competitor such as Foresight, and would provide an unfair competitive advantage in developing and/or marketing its competing products and services.

**Kittle's Resignation**

43. On January 22, 2025, Kittle told me that he intended to resign from FMI, effective February 5, 2025. Initially, I misheard Kittle when he told me about his future company and I did not hear that he intended to join Foresight. Instead, I thought he had said that he would be joining a pharmaceutical company, which would not be considered a competitive threat. I made a comment about additive experience that will come from being on the partner's side to Kittle that should have put him on notice that I had misheard him, and that I mistakenly believed he was joining a pharmaceutical company. He did not correct my misimpression.

44. I asked Kittle when he would be starting his new job, and whether he would have some time off in between jobs. And he indicated that he was not sure since the company was eager to have him start right away, so it could be right after his last day at FMI on February 5, as he informed me he was giving two weeks' notice to FMI.

45. I understand that FMI offered Kittle the opportunity to rescind his acceptance of employment with Foresight and remain with FMI until he could find reasonable, non-competitive employment. I also understand that he refused, stating via email that he believes he can comply with the Agreement in his role with Foresight.

46. I completely disagree that Kittle can comply with this Agreement given his role with Foresight.

47. FMI has located a Foresight job description that appears to be the description for Kittle's new role. That description states that he will be required to "[s]upport cross functional teams accountable for product launch planning and coordinate product-related activities," "establish a robust pipeline of product enhancements," "inform product portfolio decisions," "identify, refine, and recommend product concepts," "conceptualiz[e] new products and/or product improvements," and more. The knowledge Kittle has about FMI's products and strategies is intrinsically tied to these job requirements with a competitive product. As a result, Kittle's new role for Foresight is a clear breach of his non-compete, and I do not understand how he believes this role will not violate the Agreement.

48. Additionally, the information Kittle learned during his employment with FMI (including but not limited to information related to the MRD Pipeline Products and Incubator Lab Services that will compete directly with Foresight's products) is highly proprietary, and would assist Foresight in competing unfairly, as noted above.

49. Given the companies' substantial competitive overlap, I do not think it is possible for Kittle to perform his responsibilities for Foresight without using his knowledge of FMI's confidential information, developed at great expense and over years, even if he tries not to.

50. I am also extremely concerned that Kittle has claimed that he has no meaningful FMI confidential information. As set forth above, Kittle had access to a wide array of FMI's confidential information regarding, among other things, its MRD Pipeline Products—including but not limited to confidential information that he, personally, stripped from a recent presentation based on concerns that it would improperly divulge proprietary information.

51. Either Kittle is aware that his representation that he does not have knowledge of FMI's confidential information is untrue, or he does not appreciate the highly confidential nature of the information he had access to (which is equally alarming).

52. Either way, Kittle's employment at Foresight represents a serious competitive threat to FMI's legitimate business interests, including protection of its confidential information and its goodwill, and I simply do not see how he can have responsibility for Foresight's competitive MRD products without inevitably drawing upon the confidential FMI information he had access to just days before starting in his new role, as he will be involved in steering development of and enhancement of directly competitive products and pipeline products, and necessarily seek to improve Foresight's offerings as they compete with FMI's products.

53. Unless Kittle is enjoined from working in a competitive capacity at Foresight, FMI will continue to face irreparable harm through loss of its confidential information and competitive edge.

I hereby declare under penalty of perjury this 7th day of February, 2025, that the foregoing is true and correct to the best of my knowledge, information, and belief.

*/s/ Farida Peters-Abbadi*

Farida Peters-Abbadi

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing ("NEF"), and copies will be served by email to all non-registrants (including Attorney Margaret Pinkham, counsel for Defendant Kittle).

*/s/ Dawn Mertineit*
Dawn Mertineit