**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FOUNDATION MEDICINE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CAMERON KITTLE,<br><br>Defendant. | Civil Action No. 1:25-cv-10298 |

**AFFIDAVIT OF ERIN PIZZONIA IN SUPPORT OF**
**PLAINTIFF FOUNDATION MEDICINE, INC.'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Erin Pizzonia, do hereby depose and state as follows:

1. I am Director, People Strategy Leader for Plaintiff Foundation Medicine, Inc. ("FMI"). I have been employed by FMI since 2021.

2. I submit this affidavit in support of FMI's motions for a temporary restraining order and a preliminary injunction against the defendant, Cameron Kittle ("Kittle"). This affidavit is based upon my personal knowledge and/or my review of FMI records.

**Kittle's Employment with FMI**

3. On January 16, 2017, Kittle joined FMI as a Product Manager. Kittle was hired by and reported to then-FMI employee John Truesdell, who I understand now works at Foresight Diagnostics ("Foresight").

4. During his FMI tenure, Kittle was promoted several times, including in March of 2018, when Kittle was promoted to Senior Product Manager.

5. In September 2019, Kittle was promoted to Associate Director, Product Marketing. The following September, Kittle's role changed to Associate Director, Corporate Strategy & Portfolio Planning.

6. In August 2022, Kittle was again promoted to Director, BioPharma Marketing, on the BioPharma Marketing & Solutions team.

7. Finally, in August 2023, Kittle was promoted to Senior Director, BioPharma Marketing.

8. As part of the process of FMI considering Kittle for the role of Senior Director, Kittle emailed Troy Schurr, FMI's Chief Biopharma Business Officer, a narrative to include in his Promotion Nomination Form. In that email, Kittle wrote about his involvement in the launch of the FoundationOne® Monitor and FoundationOne® Tracker products, and specifically noted the new business relationships that resulted from these launches. He also highlighted his role in having marketing materials "approved through PRC to think differently about our product roadmap in [BioPharma], leading by example with detailed development plans," and the like. He also noted that he was a leader who was "sought-out for his perspective across all groups in BioPharma, as well as key stakeholders in Medical, Commercial, R&D, to make the result better . . . "

9. Kittle received a number of raises, bonuses, and other consideration during his tenure with FMI. At the time his FMI employment ended, his base salary was nearly $240,000. Evidencing the key role he played at FMI, Kittle was one of fewer than 20 FMI employees (and the only employee in the BioPharma group) to receive a long-term equity retention award in September 2024, consisting of an equity grant worth over $140,000.

**Kittle's Non-Competition and Other Obligations To FMI**

10. On August 14, 2023, FMI sent Kittle a promotion offer letter in connection with his proposed new role as Senior Director, BioPharma Marketing (the "Promotion Letter," attached here as **Exhibit 1**).

11. The Promotion Letter informed Kittle that if he accepted the new role, his

annualized base salary would be $230,000—a $30,000 increase from his prior role. Kittle later received a further increase in his base salary.

12. The Promotion Letter also noted that in the new role, Kittle's annual short-term incentive bonus target would be 25% of his base salary rate, which was higher than the previous target percentage, and his long-term incentive bonus target nearly doubled from 42% to 75%.

13. The Promotion Letter also provided that in order to receive the proposed promotion and its associated benefits, Kittle would be required to execute a new Employee Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement (the "Agreement"), which was attached as Exhibit A to the Promotion Letter. The Agreement is also attached here as **Exhibit 2**).

14. On August 30, 2023, Kittle accepted the promotion by executing the Agreement and the Promotion Letter, and continued to accept the associated benefits until his resignation (and as set forth below, even after he resigned). This included a bonus of nearly $50,000 that he received after executing the Agreement, which he was not entitled to prior to executing the Agreement.

15. As far as I am aware, Kittle never expressed any concern or confusion to FMI as to what the Agreement required, whether it was supported by adequate consideration, or whether it was reasonable and necessary to protect FMI's interests. In fact, Kittle was already bound by a pre-existing restrictive covenants agreement with substantially similar covenants, so he was presumably familiar with its terms.

**Kittle's Resignation**

16. I understand that in December 2024, Kittle met with FMI's in-house counsel to ask if FMI enforced non-compete agreements against former employees. FMI's in-house counsel advised that FMI did typically enforce such obligations where a former employee went to a competitor in a competitive role. I understand that Kittle did not ask if FMI considered Foresight

to be a competitor.

17. On January 22, 2025, Kittle told me that he intended to resign from FMI, effective February 5, 2025, to join Foresight in a "Lifecycle Management" role. I told him that his anticipated role with Foresight was potentially a violation of his non-compete under the Agreement. I understand that Troy Schurr, FMI's Chief Biopharma Business Officer, also told Kittle that his anticipated role with Foresight implicated his non-compete obligations.

18. Shortly after my initial conversation with Kittle, I called him back and told him that because Foresight is a direct competitor, FMI would shut off his access to its systems (which in fact occurred that day). I also informed him that he had two options: first, if he chose to join Foresight, FMI would enforce his non-compete, including through litigation. However, I also offered him the opportunity to rescind his acceptance of Foresight's employment offer, in which case he could remain employed by FMI without reprisal, until he could find non-competitive employment. I also encouraged him to speak with FMI's in-house counsel. I asked Kittle to decide by 4:00 P.M. that day whether he intended to join Foresight so that FMI could take appropriate measures.

19. At 4:00 P.M. on January 22, Kittle emailed me to confirm that he would pursue his anticipated role with Foresight. In response, I reiterated that since he was leaving for a competitor, FMI had terminated his access to its systems, although per FMI's standard practice, it would honor his two week notice and anticipated last day of employment, meaning that he would continue to be paid and provided with benefits through February 5, 2025, which he had identified as his last day of employment with FMI. I also attached a copy of the Agreement and reminded Kittle of his obligations in that document. A true and accurate copy of the January 22 email exchange is attached here as **Exhibit 3**.

20. Given Kittle's two week notice, and his comments to other FMI employees that he would be starting work at Foresight on or after February 6, 2025, he remained employed by FMI and on its payroll until February 5, 2025.

21. However, FMI learned on the afternoon of February 4 that Kittle had in fact started working for Foresight on January 27—again, while still employed by, and receiving a paycheck and benefits from, FMI.

22. To my knowledge, Kittle never told anyone at FMI that he had expedited his start date with Foresight. FMI would not have continued to pay for his salary and benefits had it been aware that he was already working for a direct competitor.

I hereby declare under penalty of perjury this 7th day of February, 2025, that the foregoing is true and correct to the best of my knowledge, information, and belief.

____*/s/*___*Erin Pizzonia*______________
Erin Pizzonia

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing ("NEF"), and copies will be served by email to all non-registrants (including Attorney Margaret Pinkham, counsel for Defendant Kittle).

*/s/ Dawn Mertineit*
Dawn Mertineit