UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-10298-RGS

FOUNDATION MEDICINE, INC.

v.

CAMERON KITTLE

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND A PRELIMINARY INJUCTION

February 20, 2025

STEARNS, D.J.

Plaintiff Foundation Medicine, Inc. (FMI) filed this breach of contract action against a former employee, Cameron Kittle, accusing him of violating the noncompetition provisions of his contract with FMI when he accepted an offer to join competitor Foresight Diagnostics (Foresight) as its chief (and solo) lifecycle management officer. Before the court is FMI's motion for a temporary restraining order and a preliminary injunction. On February 19, 2025, the court convened a hearing on the motion. For the following reasons, the court will allow FMI's motion for a restraining order.

"The Court applies the same standard in assessing requests for temporary restraining orders and preliminary injunctions." *Goldstein v.*

*Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023). "The plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *Id.*, quoting *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020).

**Likelihood of Success on the Merits**

"Under Massachusetts law, to prove a breach of contract claim, a plaintiff must show: 1) existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages from the breach." *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127-28 (D. Mass. 2011).

FMI easily satisfies the first element.[1] It has offered a copy of the employment contract signed by Kittle (the authenticity of which is unchallenged) that expressly prohibits him from working for a competitor in

---

[1] To the extent that Kittle relies indirectly on the material change doctrine, the argument is unpersuasive. Under Massachusetts law, a "non-solicitation agreement or covenant not to compete may be deemed void if there are material changes in the employment relationship between an employee and the employer." *NuVasive, Inc. v. Day*, 954 F.3d 439, 444 (1st Cir. 2020). A change in work schedules from 2.5 days in person in an office to 3 days is not a material change within the meaning of this doctrine regardless of its impact on Kittle's time spent commuting to work.

the same or similar position that he held at FMI for one year post-employment. And while Kittle questions the fairness of the restrictions on his post-employment opportunities, his arguments have no legal standing. The restriction serves to protect FMI's confidential information, a purpose that has been time-honored by courts as a legitimate business interest.[2] *See, e.g., Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 810 (2020) ("In the employer-employee context, the legitimate business interests that may be protected consist of trade secrets, confidential information, and good will.").[3] And while the scope of the restrictions placed on Kittle by his

---

[2] Although Kittle suggests that this business interest is adequately protected by the admittedly binding confidentiality and non-solicitation provisions of his contract, the court, while not questioning the purity of Kittle's intentions, is not convinced. An employee "does not go with *tabula rasa* with respect to [the former employer's] products, its development strategies, its marketing plans, its customers and other significant business information." *Cynosure LLC v. Reveal Lasers LLC*, 2022 WL 18033055, at *12 (D. Mass. Nov. 9, 2022), quoting *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995). Indeed, "[i]t is difficult to conceive how all of the information stored in [the former employee's] memory can be set aside as he applies himself to a competitor's business and its products." *Cynosure LLC*, 2022 WL 18033055, at *12, quoting *Marcam Corp.*, 885 F. Supp. at 297.

[3] Contrary to Kittle's attorney's argument, confidential and proprietary information may be entitled to protection even if the information cannot be claimed as a "trade secret," *Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 49 (1998), while conversely, some marketing compilations, like customer lists may qualify as trade secrets, *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 163 (1999). The law has generally taken a flexible approach in identifying the scope of a legitimate business interest.

noncompete agreement is admittedly geographically broad, a nationwide (or even worldwide) "restriction is not necessarily unreasonable *per se.*" *Anaqua, Inc. v. Bullard*, 2014 WL 10542986, at *5 (Mass. Super. July 24, 2014), *aff'd*, 88 Mass. App. Ct. 1103 (2015).  FMI markets its products nationwide to customers – a matter that is not contested – so the nationwide scope of the restrictions placed on Kittle is reasonable.

Turning to the question of breach, the court again finds that FMI has met its burden.  At the outset, the court notes that FMI has consistently viewed Foresight as a competitor in formulating its internal marketing strategy (well before this litigation began),[4] *see, e.g.*, Peters-Arbadi Aff. [Dkt # 9] ¶¶ 20-21; *see also* Pizzonia Aff. [Dkt # 10], Ex. 3 ("Since you're leaving for a competitor, we have terminated your access, per our standard procedure."), and that Kittle himself identifies Guardant Health, TempusAI, and NeoGenomics as being competitors of both FMI and Foresight, *see* Kittle Aff. [Dkt # 17] ¶¶ 28, 199.  There can be no doubt that the companies operate in overlapping fields.  They both offer products for the early detection of

---

[4] Indeed, FMI began publicizing its forthcoming MRD products after Foresight gave a presentation heralding the sensitivity of its own MRD products.  Peters-Arbadi Aff. ¶ 33.  There would have been no reason for FMI to disclose the development of its MRD products if it did not fear that Foresight, as a competitor, was gaining too much of an early toehold in the field.

cancer, and FMI has longstanding and concrete plans to enter the molecular residual disease (MRD) market in which Foresight is now dominant.  And while they presently target different types of cancers, Kittle admits that Foresight is "in the RUO phase" for a version of its product addressed to solid tumors, on which FMI's offerings are focused.  *See id.* ¶ 103.

To the extent Kittle attempts to place his role at Foresight outside of the scope of his non-compete agreement (because the work he performs at Foresight is substantively different from the work that he performed for FMI), he again fails to convince the court.  The Foresight job description for Senior Director of Lifecycle Management specifies that "[c]ollaborat[ing] with the marketing organization" and "[r]eview[ing] competitive intelligence routinely and leverag[ing] the learnings into conceptualizing new products and/or product improvements" are among the core responsibilities of the Senior Director.  *See* Kittle Aff., Ex. 2 at 1-2.  These vocational goals clearly overlap substantively with the responsibilities he was charged with at FMI.  *See* Kittle Aff. ¶ 43 (acknowledging that he "made draft plans for promotional materials needed in 2025 to support a launch and suggested tradeshows or events to use these materials"); *see also id.* ¶ 26 (noting that one of his direct reports was responsible for competitive intelligence and customer objection handling and conceding that, when the employee was laid off in June 2024,

he had at least "limited responsibility" for these tasks, which had been shifted to his team); *id.* ¶ 24 ("In my last role at FMI, I managed a team of four people and made decisions on what products to market when and in which channels, what narrative story and messages to highlight about these products, and I had to understand what other companies were messaging about their competing products and services and in which channels.").

**Irreparable Harm**

"To establish irreparable harm, . . . a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). It is enough that "the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages." *Id.*

FMI has met its burden of establishing that it is likely to suffer an injury that cannot be compensated by money damages if Kittle continues to work for Foresight. Kittle agreed in his employment contract that any violation of the non-competition provision would "cause irreparable injury to the Company." Pizzonia Aff., Ex. 2 at 4; *see DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 120 (D. Mass. 2024), *aff'd*, 118 F.4th 416 (1st Cir. 2024) (finding irreparable harm where, *inter alia*, the employee had agreed any breach of the non-competition provision would cause immediate and

irreparable harm). And while the court has no reason to disbelieve Kittle's testimony that he does not intend to disclose FMI's confidential information, his role at Foresight places him in a position where inadvertent disclosure is almost inevitable. Kittle had access to FMI's marketing strategy for its solid tumor offerings and learned enough about its planned MRD test to draft preliminary marketing materials. "Even if [he] thinks he is keeping [FMI's] secrets, he will, as [Foresight's] employee inevitably, even if inadvertently, be influenced by the knowledge he possesses of all aspects of [FMI's] development efforts" and thus provide Foresight with "an advantage . . . as it contemplates its own strategies." *Marcam Corp.*, 885 F. Supp. at 297.

It is no answer to say that the prospect of harm is, at least for the moment, speculative. FMI has plans to launch its competing product imminently, and the fact that it "cannot [now] point to direct evidence of misuse of its confidential information is not a bar to enforcing the noncompetition covenant." *Anaqua, Inc*, 2014 WL 10542986, at *14. Courts often find "irreparable harm . . . triggered where the defendant has likely violated his noncompetition agreement" precisely because it is difficult to detect or prove when and if, and to what degree, confidential information has been misused. *DraftKings Inc.*, 732 F. Supp. 3d at 120 (D. Mass. 2024).

**Balance of Hardships**

The court acknowledges that an injunction will create a hardship for Kittle. This hardship, however, is "the consequence of enforcing [his] covenant not to compete," a covenant he entered voluntarily and for which he was generously compensated, and the personal inconvenience wrought by Kittle's unforced personal decision to leave FMI for a competitor is outweighed in any event by the potential harm to FMI. *DraftKings Inc.*, 732 F. Supp. 3d at 120 (D. Mass. 2024).

**Public Interest**

The court recognizes "the importance of early detection and treatment of cancer as a matter of public interest and public policy." Opp'n [Dkt # 16] at 27. Issuing a preliminary injunction here, however, will not in any way impact the access of the public to MRD tests (it may in fact serve to expand the range of consumer choice). And it will also serve the interest of the federal government and Massachusetts in encouraging business development by protecting confidential information and trade secrets.

**ORDER**

For the forgoing reasons, the motion for a temporary restraining order and preliminary injunction is <u>ALLOWED</u>.  Kittle is preliminarily enjoined until February 5, 2026, or until further order from the Court, from:

1. Directly or indirectly, rendering services to, giving advice to, consulting with, or being employed by any entity that develops, manufactures or markets any genomic profiling testing services or products, genomic data and information services or products, or other genomic services or products, in each instance in the field of oncology, that are competitive with the products or services of FMI, if such activity: (1) involves supervising or managing employees who compete with FMI with respect to the same or similar services as those for which Kittle was responsible for FMI since February 5, 2023; (2) requires Kittle to provide the same or similar services as those (i) for which he was responsible for FMI since February 5, 2023, or (ii) for which those whom he supervised or managed since February 5, 2023 were responsible; or (3) requires or is likely to involve the use, disclosure, or potential disclosure of FMI's confidential information. For the avoidance of doubt, Kittle is hereby enjoined from working for Foresight Diagnostics;

2. Using, or disclosing or transferring to anyone outside FMI (including but not limited to Foresight) any FMI confidential information; and

3. Deleting, destroying, or otherwise altering any FMI confidential information.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE